1

2                    UNITED STATES DISTRICT COURT

3                         DISTRICT OF OREGON

4                        PORTLAND DIVISION

5

6  CHRISTIAN P. FINTICS,                )
                                        )
7                  Plaintiff,           )      No. 03:10-cv-01352-HU
                                        )
8  vs.                                  )
                                        )
9  MICHAEL J. ASTRUE,                   )   **MEMORANDUM OPINION AND ORDER**
   Commissioner of Social Security,     )
10                                      )
                   Defendant.           )
11

12              _____

13

14 James S. Coon
   Swanson, Thomas & Coon
15 820 S.W. Second Ave., Suite 200
   Portland, OR 97204
16
        Attorney for Plaintiff
17

18

19 S. Amanda Marshall
   United States Attorney
20 Adrian L. Brown
   Assistant United States Attorney
21 1000 S.W. Third Avenue, Suite 600
   Portland, OR 97204-2904
22

23 David Morado
   Regional Chief Counsel, Region X, Seattle
24 Keith Simonson
   Special Assistant United States Attorney
25 Social Security Administration
   Office of the General Counsel
26 1301 Young Street, Suite A-702
   Dallas, TX 75202
27
        Attorneys for Defendant
28

1 - MEMORANDUM OPINION AND ORDER

1  HUBEL, United States Magistrate Judge:

2      The plaintiff Christian P. Fintics seeks judicial review
3  pursuant to 42 U.S.C. § 405(g) of the Commissioner's final decision
4  denying his applications for Disability Insurance ("DI") benefits
5  under Title II of the Social Security Act, 42 U.S.C. § 1381 *et*
6  *seq.*, and Supplemental Security Income ("SSI") under Title XVI of
7  the Act.  The parties have consented to the jurisdiction of, and
8  entry of final judgment by, the undersigned pursuant to 28 U.S.C.
9  § 636© and Federal Rule of Civil Procedure 73(b)(1).

10     Fintics argues the Administrative Law Judge ("ALJ") erred in
11 posing an inaccurate hypothetical question to the vocational
12 expert, failing to find his testimony fully credible, and failing
13 to make any findings as to the credibility of his testimony
14 concerning the effects of his use of alcohol.  *See* Dkt. ##19 & 32.
15 For the reasons discussed below, I find the case should be remanded
16 for further proceedings, clarification of the ALJ's findings, and
17 consideration of whether Fintics's alcoholism is a contributing
18 factor material to the determination of disability.

19

20          *I.  PROCEDURAL BACKGROUND*

21     Fintics filed his applications for SSI and DI benefits on
22 July 28, 2006, claiming disability due to bipolar disorder,
23 depression, anxiety, PTSD, lower back and right hip pain, and
24 intermittent numbness in his left leg.  The Record is inconsistent
25 with regard to the date Fintics alleges he became unable to work
26 due to these disabling conditions.  His applications for SSI and DI
27 benefits were computer-generated by someone at the Social Security
28 Administration, and neither is signed by Fintics.  Both of those

2 - MEMORANDUM OPINION AND ORDER

1  applications list an alleged onset date ("AOD") of June 25, 2003.
2  *See* A.R. 111, 116.  However, in an undated and unsigned "Disability
3  Report - Adult," also a computer-generated form likely completed by
4  someone at the Social Security Administration from an interview
5  with Fintics, his AOD is listed as September 15, 2001. A.R. 148.
6  At the ALJ hearing, the ALJ noted Fintics's AOD was September 15,
7  2001, and asked him questions relating to that time period.
8  A.R. 23.  The ALJ also listed Fintics's AOD as September 15, 2001,
9  in his decision.  A.R. 56, 64.  Citing these sources, the parties
10  appear to agree that Fintics's correct AOD is September 15, 2001.
11  *See* Dkt. #19, p. 2 (citing A.R. 56); Dkt. #25, p. 5 (citing A.R.
12  148).  But in the ALJ's decision, he noted that "no medical records
13  were made available prior to 2003 . . . [and] [c]onsequently, the
14  medical evidence of record did not establish any medically
15  determinable impairments prior to 2003."  A.R. 59.  Fintics's AOD
16  should be clarified upon remand.  The parties agree that Fintics's
17  date last insured for purposes of DI benefits was December 31,
18  2008. Dkt. #19 p.2; A.R. 58.

19       Fintics's applications were denied initially and on recon-
20  sideration.  He requested a hearing, and a hearing was held on
21  August 6, 2009, before an ALJ.  Fintics testified on his own
22  behalf, and a Vocational Expert ("VE") also testified.  *See* A.R.
23  20-48.  On September 1, 2009, the ALJ issued his decision, denying
24  Fintics's applications for benefits.  *See* A.R. 53-64.  Fintics
25  appealed the ALJ's decision, and on August 27, 2010, the Appeals
26  Council denied his request for review, making the ALJ's decision
27  the final decision of the Commissioner.  20 C.F.R. §§ 404.981,
28  416.1481.  Fintics filed a timely Complaint in this court seeking

3 - MEMORANDUM OPINION AND ORDER

1  judicial review of the Commissioner's final decision denying his
2  applications for benefits.  Dkt. #2.

3

4                    ***II.  FACTUAL BACKGROUND***

5  **A.    Summary of the Medical Evidence**

6      Fintics has been treated for multiple medical problems.  The
7  court will limit its discussion of his medical history to his
8  mental health problems, and his allegations of chronic pain.

9      In November 2003, Fintics was involved in a Risk Intervention
10 Program for alcoholism through the Old Town Clinic.  He reported
11 drinking only once or twice a year, but binging at those times,
12 something he stated he had been doing since a very young age.  He
13 also reported using marijuana occasionally.  A.R. 404.

14     On December 24, 2003, Fintics was admitted to the hospital
15 through the emergency room, for symptoms of depression.  He
16 reported being sober for four months, and stated "he was unable to
17 sleep and . . . was depressed due to his recovery from drug and
18 alcohol use.  His thoughts were racing. . . .  He was quite
19 tearful, he had suicidal thoughts and said that he had been
20 thinking about jumping off a bridge."  A.R. 268.  He acknowledged
21 having "a severe alcohol problem," but his "longstanding alcohol
22 and cocaine dependence . . . [had] been in full sustained
23 remission."  *Id.*  His Axis I[1] diagnoses on admission were "Suicidal

24

25         [1]The American Psychiatric Association's *Diagnostic and Statis-*
   *tical Manual of Mental Disorders* (4th ed. 2000) ("DSM-IV")
26 organizes psychiatric diagnoses into five dimensions, each of which
   "refers to a different domain of information that may help the
27 clinician plan treatment and predict outcome."  DSM-IV at 27.
   Axis I is clinical disorders, including substance use disorders;
28                                                    (continued...)

4 - MEMORANDUM OPINION AND ORDER

1  ideation - resolved," "Bipolar disorder - depressed," "Alcohol

2  dependence, in partial remission x4 months," and "Cocaine

3  dependence in full sustained remission." A.R. 269. His GAF was

4  estimated at 45. *Id.* He was started on Depakote and Remeron. *Id.*

5  He spent two days in the hospital, and was discharged with three

6  days' worth of Depakote 750 mg at night, and Remeron 30 mg at

7  bedtime. On discharge, he had diagnoses of "bipolar disorder,

8  depressed, alcohol dependence, in partial remission, and cocaine

9  dependence in full sustained remission." A.R. 250.

10      Three days after his hospital discharge, he saw Ann Gander

11  ("NP Gander"), a Psychiatric and Mental Health Nurse Practitioner

12  ("PMHNP"), at Old Town Clinic's Walk-In Mental Health Clinic, to

13  establish mental health care. (Fintics already was a patient at

14  the clinic for treatment of hyperglycemia, an umbilical hernia,

16      **1**(...continued)
17  Axis II is personality disorders and intellectual disabilities;
    Axis III is general medical conditions; Axis IV is psychosocial and
18  environmental problems; and Axis V is the patient's Global Assess-
    ment of Functioning, or "GAF." *Id.*

19
            The GAF scale is used to report a clinician's
20          judgment of the patient's overall level of
            functioning on a scale of 1 to 100. A GAF of
21          51-60 indicates moderate symptoms (*e.g.*, flat
            affect and circumstantial speech, occasional
22          panic attacks or moderate difficulty in
            social, occupational, or school functioning.
23          A GAF of 61-70 indicates some "mild symptoms
            (*e.g.*, depressed mood and mild insomnia) or
24          some difficulty in social, occupational, or
            school functioning . . ., but generally func-
25          tioning pretty well, has some meaningful
            interpersonal relationships." *Diagnostic and*
26          *Statistical Manual of Mental Disorders IV*
            (DSM-IV) 31-34 (4th ed. 2000).
27
28  *Raegen ex rel. Syzonenko v. Astrue*, slip op., No. 10-CV-401-BR,
    2011 WL 1756131 at *5 n.3 (D. Or. May 9, 2011) (Brown, J.).

5 - MEMORANDUM OPINION AND ORDER

1  hypertension, lower extremity edema, and other acute problems and

2  illnesses as they arose.)

3      Fintics reported a history of depression connected with

4  repeated attempts to stop drinking.  He described his symptoms as

5  follows:

6          [Fintics] describes his mood as sad and often
           hopeless, not feeling like living.  He reports
7          he has very little interest in activities that
           he used to enjoy.   Insomnia has been a
8          constant companion.  He also has fatigue every
           day and although he denies feelings of worth-
9          lessness, he definitely ascribed to very low
           self esteem.   He also described himself as
10         lonely and sad, often irritable, worrying
           excessively.  He has had a plan for suicide in
11         the past, but he has never taken steps to
           execute the plan.   He currently denies any
12         suicidal ideation.   [He] also has diminished
           ability to think or concentrate or make deci-
13         sions.   Sometimes his thoughts race and at
           other times, he has no thoughts at all.

14
           [Fintics] reports that these depressions
15         always come up when he starts accruing clean
           time.  The time between episodes shortens and
16         the length of those depressive periods
           increase[s].  [He] also shared that there are
17         also periods when he has grandiosity, feels
           pressure to keep talking, worrisome thoughts
18         and he is easily distracted and over-
           stimulated[,] [w]hen he engages in more goal-
19         directed activities, and also sexual involve-
           ment in risky, pleasurable activities.   He
20         denies having ever been arrested during these
           times and they do not sound extreme enough to
21         qualify for mania, but they certainly do seem
           to indicate a hypomania. [He] says these mood
22         swings occur during periods of sobriety and
           they seem to be much worse then. Signifi-
23         cantly his drugs of choice were alcohol and
           marijuana.

24

25  A.R. 400.

26      NP Gander diagnosed Fintics with "bipolar II disorder,

27  depressed, moderate."  *Id.*  Fintics did not want to continue taking

28

6 - MEMORANDUM OPINION AND ORDER

1  Depakote, and he was switched to Wellbutrin for depression and
2  Gabitril for mood disorder.  *See* A.R. 398.

3      Fintics began individual counseling with Certified Alcohol and
4  Drug Counselor Pam Griffin on December 31, 2003.  Fintics stated he
5  had never been able to maintain long-term sobriety due to the
6  severe depression he suffers.  He was "beginning to feel some hope"
7  on the Wellbutrin and Gabitril.  He gave a detailed chronology of
8  his symptoms of depression beginning at around age ten, when his
9  family moved from southern Germany to a "very isolated" military
10 base in northern California.  He described being in a constant
11 state of fear from his alcoholic father, who often was violent and
12 hit Fintics's siblings.  Fintics had suffered the loss of his
13 brother, who died in 1995, at age 34, and also the loss of his
14 long-time girlfriend.  These combined losses "added so much fuel to
15 his depression that he felt like giving up."  *Id.*  He had some
16 short-term therapy at age sixteen, and saw a therapist again for a
17 few months in 1989, but he had never been treated with anti-
18 depressants before December 2003.

19     Griffin noted that Fintics had a "fairly flat affect, and
20 talk[ed] in a rather monologue fashion with great attention to
21 detail and chronology, rather like a rehearsed script."  *Id.*
22 Griffin observed that Fintics had "many symptoms of PTSD," noting
23 his childhood was "like living in a war zone."  *Id.*  She diagnosed
24 him with bipolar disorder II, and "[p]ossibly PTSD."  A.R. 399.

25     At future sessions, Fintics continued to evidence pressured
26 speech, and to have hypomania symptoms.  On January 2, 2004,
27 NP Gander switched Fintics from Gabitril to Lamictal to control his
28 hypomania.  (A.R. 397)  Fintics had a counseling appointment

7 - MEMORANDUM OPINION AND ORDER

scheduled for January 14, 2004, but he appeared at the Walk-In Mental Health Clinic on January 12, 2004, stating his symptoms had been worsening for the previous 72 hours. He reported "feelings of tension and anxiety, confusion overload, . . . butterflies in his stomach . . . [and] repetitive thoughts, depressed mood and racing mind." A.R. 396. NP Gander noted Fintics appeared "very anxious and distressed." *Id.* She reduced his Wellbutrin dosage and added Seroquel, continuing the Lamictal. She diagnosed Fintics with "Bipolar I disorder, most recent episode mixed, moderate." *Id.*

When Fintics returned on January 14, 2004, he saw PMHNP Jean Akins ("NP Akins"), and reported being too groggy on the Seroquel. On his own, he had reduced his Wellbutrin to 150 mg/day. He felt "lonely sad, irritable and nervous," as well as anxious. He exhibited a flat affect, maintained poor eye contact, and became tearful during the session. The counselor noted it was unclear if Fintics had bipolar II disorder, hypomania, or anxiety. He had pressured speech and evident anxiety, and NP Akins suspected "some OCD." A.R. 395. She noted Fintics had no insurance and no source of income, so his medication options had been limited to samples available through the clinic. He was having a possible allergic reaction to Lamictal, so it was discontinued, and he was given samples of Remeron, the drug prescribed for him in the hospital. NP Akins noted, "Axis I diagnosis, provisional: Bi-Polar II, depressed mood . . . Rule out Obsessive-Compulsive Disorder." *Id.*

On January 21, 2004, Fintics saw NP Akins, and reported sleeping better and feeling calmer, more focused, and more interested in daily activities. His speech was less pressured, and NP Akins noted his speech was less compulsive. He was continued on

8 - MEMORANDUM OPINION AND ORDER

Wellbutrin SR 100 mg in the morning, and Remeron 15 mg in the evening.   His Axis I diagnosis was Bipolar II disorder, and NP Akins estimated his GAF at 65.  A.R. 394.

Fintics saw NP Akins on January 28, 2004, and reported continued improvement.  He was calmer and his mood was better.  He continued to have restless sleep, and to awaken feeling not fully rested, but he had no symptoms of sadness, loneliness, or irritability.  His Remeron was increased to 30 mg in the evening, with no change to the Wellbutrin dosage.  His diagnosis remained Bipolar II disorder, and his GAF was estimated at 70.  A.R. 393.

Fintics saw counselor Griffin on February 2, 2004, stating the previous weekend had been very stressful for him.  He felt lonely being away from his family, and he also was concerned about his housing situation.  He was sleeping better, but still felt groggy in the morning, and he noted he was "drinking too much coffee late in the afternoon."  He discussed more about his early life with his violent, alcoholic father, and feelings about his relationship with his mother.  A.R. 392.

On February 19, 2004, Fintics saw NP Akins for followup.  He was back on Seroquel, and was sleeping well on the medication "and not feeling depressed."  A.R. 391.  He exhibited some pressured speech and obsessive thinking, but this was much improved over past clinical observations.  His behavior during the session affirmed NP Akins's impression "that rather than Bipolar disorder this client has an anxiety disorder with depressed mood.  This may be Post Traumatic Stress Disorder or it may be major depression and an anxiety disorder."  *Id.*  He was continued on Wellbutrin SR 100 mg

9 - MEMORANDUM OPINION AND ORDER

1  in the morning, and Seroquel 25 mg, one tablet in the morning and
2  50-100 mg at bedtime. *Id.*

3       Fintics saw counselor Griffin on February 19, 2004. He had
4  moved in with another person in recovery, and was feeling better in
5  the quiet environment. He reported "going to a lot of meetings and
6  talk[ing] to his sponsor daily." A.R. 390. He stated he had
7  fourteen years of on-and-off recovery, involving "several short
8  relapses during that time." *Id.* The therapist noted Fintics
9  appeared more relaxed and "humorous." *Id.*

10      Fintics saw Griffin on March 3, 2004, with no noted changes in
11 his treatment protocol. A.R. 389. He saw NP Akins on March 11,
12 2004, appearing with a fairly flat affect, "quite subdued and
13 quiet." A.R. 388. Fintics had spontaneously stopped taking all of
14 his medications, stating they made him feel "not like himself."
15 *Id.* He planned to continue seeing Griffin for individual therapy,
16 and his alcohol and drug counselor Doug, and working on his
17 problems without medication. His diagnosis at this visit was PTSD,
18 with a current GAF estimated at 60. *Id.*

19      Fintics saw Griffin on March 15, 2004. He was still off all
20 medications, and Griffin noted Fintics's affect was "brighter than
21 it has been over the last few weeks." A.R. 387. He was nearing
22 the end of his alcohol treatment program, and he was resisting
23 suggestions to broaden his support group. *Id.*

24      On June 8, 2004, Fintics saw Wendy Callander, M.D. at the Old
25 Town Clinic, complaining of fatigue, weakness, and depression. He
26 wanted to see a naturopath, and return to taking vitamin B.
27 A.R. 385.

28

10 - MEMORANDUM OPINION AND ORDER

1    On January 8, 2006, Fintics arrived at the ER by ambulance
2  with complaints of "abdominal pain related to his alcohol use.  He
3  said that if they could not make the pain go away, he would jump
4  off a bridge."  A.R. 249.  He stated he had "been on a two-week
5  drinking binge and . . . [had] not been eating well during this
6  period."  A.R. 261.  His labs were normal.  He was given Vicodin,
7  but continued to state that he would "jump off a bridge due to
8  depression" from an alcohol relapse.  He was put on psychiatric
9  hold, and was admitted to the psychiatric unit.  A.R. 249.  On
10 admission to the unit, he "refused to change into scrubs or engage
11 in the general admission process until he had a shower.  He
12 repeatedly asked for food.  When given soup, dinner rolls and
13 juice, he demanded the tray be ordered.  He denied suicidal
14 thoughts to staff, stating, 'I love the Lord too much to do that.'"
15 A.R. 250.

16    Fintics apparently had suffered an ankle fracture on
17 December 2, 2005, and stated he had been doing well and staying
18 sober prior to that time, but "everything got stirred up because of
19 his ankle fracture."  *Id.*  He was given Vicodin for the fracture,
20 and when he ran out, "he relapsed on alcohol and could not stop
21 drinking.  He came to the emergency room because he wanted to die
22 because the gastrointestinal pain was so bad."  *Id.*  He was not
23 willing to consider alcohol treatment, and he would not accept any
24 of the alternative treatment options that were offered to hm.  *Id.*
25 He was discharged on January 11, 2006, with prescriptions for
26 Phenergan and Protonix; a recommendation to use Mylanta, and to
27 avoid caffeine, coffee, aspirin, naprosyn, ibuprofen, alcohol, or
28 peppermint; and referrals to clinics for followup.  A.R. 251-52.

1    Fintics saw naturopathic physician Kipp Bajaj, N.D., at the
2 Old Town Clinic, on December 22, 2006. Fintics had started taking
3 oral melatonin at Dr. Bajaj's recommendation, but his fatigue,
4 agitation, and restlessness had actually increased. A.R. 384.

5    On January 12, 2007, Fintics saw PMHNP Carol Burckhardt
6 ("NP Burckhardt") for a mental health evaluation. He stated he had
7 been feeling "okay" since November 2006. Before that, his
8 depression was "really bad" from November 2005 into much of 2006 -
9 he had difficulty getting out of bed, had decreased appetite, felt
10 hopeless, had suicidal thoughts, and felt isolated and in deep
11 despair. Currently, he was feeling better, and he had been clean
12 and sober since November 2, 2006, when he had gone to a clinic for
13 detox. Notes indicate his PTSD was "fairly well documented in his
14 history relating to excessive emotional and physical abuse by his
15 father including his father attempting to kill his mother when he
16 was a young teenager." A.R. 379. Fintics exhibited generalized
17 anxiety, with restlessness and some irritability. He did not want
18 to take any kind of Western medicine, preferring some type of
19 herbal strategy to deal with his symptoms of depression. He was
20 advised to take melatonin in the afternoon instead of late in the
21 evening, to improve his sleep cycle. NP Burckhardt did not think he
22 needed an antidepressant at that time. A.R. 380.

23    On March 20, 2007 Fintics saw Dr. Bajaj for followup of his
24 depression, insomnia, obesity, and lower extremity edema. Fintics
25 described his "struggles with depression off and on through his
26 lifetime. He . . . had a very bad year last year while he was
27 still actively using. Since getting clean and sober and engaging
28 in a chemical dependency treatment, he says he has had approxi-

12 - MEMORANDUM OPINION AND ORDER

1  mately 3 bouts of depression." A.R. 1401. He was still seeing
2  NP Burckhardt regularly, but had refused recommended medications,
3  preferring to pursue natural remedies. He described manic as well
4  as depressed episodes. *Id.* Dr. Bajaj recommended a trial of a
5  natural antidepressant such as St. John's Wort, which Fintics
6  declined. He wanted to try a natural protocol he had obtained from
7  "his Christian-based spiritual teacher," consisting of D vitamins
8  and various herbs. Dr. Bajaj indicated, "I am more than willing to
9  do this with him." A.R. 1402.

10     On April 10, 2007, Fintics saw Dr. Bajaj for followup of
11 depression with increased manic symptoms, hypertension, and
12 obesity. Fintics stated his depression was becoming an increasing
13 problem in terms of his ability to function day to day. He had
14 experienced episodes of mania, was not sleeping, and was fatigued.
15 He was exercising some and doing some stretching. He was advised
16 to see NP Burckhardt to discuss mental health treatment options.
17 A.R. 1400.

18     On April 12, 2007, Fintics saw NP Burckhardt regarding his
19 insomnia. Fintics stated his moods were "quite unstable," varying
20 from mania, when he could not sleep, to depression, when he still
21 could not sleep. He was given samples of Vistaril 25 mg, with
22 directions to take two at bedtime. A.R. 1398.

23     On April 24, 2007, Fintics saw Dr. Bajaj for followup of
24 depression with anxiety, insomnia and sleeplessness, and borderline
25 hypertension. He had been having depression with mild anxiety for
26 about a week, with onset "shortly after his last episode of mania."
27 A.R. 1393. He had feelings of "hopelessness, frustration,
28

13 - MEMORANDUM OPINION AND ORDER

1  irritability, sadness, and loneliness." *Id.* He was resistant to
2  taking any pharmaceutical-based medications. *Id.*

3      On May 8, 2007, Fintics saw Dr. Bajaj for followup of
4  depression, hypertension, sleep disorder, COPD, and tobacco
5  dependence. He had just returned from a ten-day Christian retreat
6  in the mountains east of Albuquerque, New Mexico, and was feeling
7  very positive about his experiences there. He denied any current
8  depression or mania, and his depression was assessed as "presently
9  stable." A.R. 1391-92.

10     On May 9, 2007, Fintics saw NP Burckhardt for followup. He
11 stated his mood was "fairly normal," but he described cycles over
12 the preceding month of alternating depression and hypomania with
13 scattered thinking. "He also is contacting an attorney as he has
14 been denied now again for SSI/SSD which concerns him very much
15 because he feels yet that he cannot work. He describes 2 years ago
16 when he worked for a short time and then relapsed." A.R. 1390. He
17 was using Vistaril to help him sleep. He was directed to keep a
18 mood journal for a month to look for patterns. *Id.*

19     On May 16, 2007, Fintics saw Benjamin Balme, M.D. at the Old
20 Town Clinic with complaints of back pain with some numbness in his
21 left anterior thigh. Ibuprofen was not helping his pain. He had
22 thickening of the Achilles tendon on the left, but otherwise his
23 objective examination was normal. X-ray findings showed "a
24 degenerative L5-S1 disc." A.R. 1389. Dr. Balme recommended he
25 quit smoking, lose weight, and exercise, starting with simple
26 walking. The doctor stated Fintics was not a surgical candidate
27 regarding his back condition. *Id.*

28

14 - MEMORANDUM OPINION AND ORDER

On June 13, 2007, Fintics saw NP Burckhardt for followup of his depression. Fintics stated he was having "a great deal of difficulty getting up in the morning." A.R. 1388. He had no energy; felt irritable, stressed, and nauseated; and his thoughts were racing. He denied current substance use, but worried that if his symptoms worsened, he would relapse with alcohol. He refused any type of mood stabilizing medication, and NP Burckhardt indicated it was difficult to know how to treat him. She encouraged him "to make use of his resources and cognitive strategies as he can." *Id.*

On June 21, 2007, Fintics saw Dr. Bajaj for followup of his hypertension, sleep apnea, "Depressive disorder," and obesity. A.R. 1386. Fintics described his depression as "stable." *Id.* He was "feeling very motivated, particularly to improve his exercise tolerance." *Id.*

Fintics saw Dr. Bajaj on August 3, 2007, for followup of his hypertension, "Anxiety with depression," and other medical issues. Fintics stated he had experienced "an episode of increased depression" from the end of May through the month of June. He thought this was aggravated after he took a course of Vicodin to manage pain from a tooth extraction. He was working closely with his pastor, and his anxiety was "now stable." A.R. 1382.

On September 19, 2007, Fintics saw Dr. Bajaj for followup of insomnia, hypertension, and "Alcohol dependence with recent relapse." A.R. 1378. Fintics stated that about four weeks earlier, he had dropped a 45-pound weight on his foot, injuring his foot and the nail of his big toe. He had gone to the ER and was given an antibiotic and Percocet. After using the Percocet for

15 - MEMORANDUM OPINION AND ORDER

several days, this "precipitated an almost 'robotic state' [and] he entered a market and purchased a box of 30 cans of beer and consumed this that night. He said that this behavior then continued for the next 5 days . . . [and] then he became very sick." A.R. 1378. He enrolled himself in an inpatient chemical dependency detox program, where he stayed for five days, being discharged on September 11, 2007. He denied any current cravings for alcohol. He was encouraged to schedule an appointment with NP Burckhardt for treatment of his bipolar disorder. A.R. 1379.

On October 31, 2007, Fintics saw Dr. Bajaj for followup of his hypertension, insomnia, and athlete's foot. His sleep was improving and becoming more restful, but he was feeling "less energized during the day." A.R. 1372.

Fintics was hospitalized from December 19 through 30, 2007, after presenting at the emergency room for depression and alcohol relapse. He had been sober until sometime in early November 2007, when he relapsed and then drank ten or more beers per day until he was hospitalized. During his hospitalization, he was started on lithium 450 mg., one in the morning and two in the evening, and Geodon, a drug used to treat bipolar disorder. At a followup with Dr. Bajaj on January 3, 2008, the doctor noted these medications had been suggested by NP Burckhardt in the past. Fintics's "presumptive diagnosis" was "bipolar II disorder." A.R. 1370; see A.R. 1367.

Fintics saw NP Burckhardt on January 3, 2008, to reestablish mental health care with her and review his medications. He was taking lithium, Geodon, and Zoloft, and felt this combination of medications was "working well for him, although he would prefer not

16 - MEMORANDUM OPINION AND ORDER

1  to be on medications." A.R. 1369.  He had been given hydroxyzine
2  while in the hospital, but had not had any since his release, and
3  he felt his panic attacks were increasing.  NP Burckhardt continued
4  his current medications and prescribed hydroxyzine 25 mg, one to
5  four times daily.  *Id.*

6   On January 15, 2008, Fintics saw Dr. Bajaj for followup of
7  several medical problems, as well as his recent alcohol relapse and
8  ongoing bipolar disorder.  He wanted to discuss the results of his
9  recent blood lithium levels.  He stated he had gained about forty
10 pounds since the beginning of his relapse.  He was diagnosed with
11 Bipolar disorder II with depression.  A.R. 1368.

12  On January 18, 2008, Fintics saw NP Burckhardt for followup of
13 his depression.  Fintics was noted to be "quite anxious" and
14 "slightly irritable."  A.R. 1366.  His symptoms were somewhat
15 decreased overall, but his diagnosis remained "bipolar I disorder,
16 last mixed and now with partial remission secondary to the
17 medications."  *Id.*

18  Fintics saw Dr. Bajaj on January 29, 2008, for followup of his
19 lower extremity edema and hypertension.  Fintics had not been using
20 prescribed compression stockings regularly, stating they were
21 uncomfortable and hard to put on, but he agreed to begin using them
22 regularly.  He stated his depression was increasing, and he had an
23 upcoming appointment with NP Burckhardt to discuss medications.
24 A.R. 1364.

25  Fintics saw NP Burckhardt on February 1, 2008, for followup of
26 his depression, which Fintics stated was getting worse.  He was
27 sleeping up to sixteen hours a day, had low motivation and energy,
28 and felt unable to function normally.  His affect was "quite

17 - MEMORANDUM OPINION AND ORDER

1  intense," and his depression was assessed at moderate-to-severe
2  level.  His Zoloft was increased to 100 mg daily.  A.R. 1363.

3      On February 8, 2008, Fintics had a medication management visit
4  with NP Burckhardt.  His mood had improved slightly, but he
5  expressed concern "about the amount of time he spends in bed
6  sleeping, his lack of motivation to get up and do anything, and his
7  continuing feelings of 'passivity.'" A.R. 1362.  He was encouraged
8  to continue with the Zoloft, and to continue taking his lithium,
9  which he wanted to stop.  *Id.*

10     On February 12, 2008, Fintics saw Dr. Bajaj for followup of
11 his bilateral lower extremity edema, hypertension, and "Bipolar II
12 with hypomania and depressive symptoms."  A.R. 1360.  Fintics
13 stated his depression was "particularly bad right now."  *Id.*  He
14 was on a trial of Zoloft, and had an upcoming appointment scheduled
15 with NP Burckhardt.  A.R. 1360-61.

16     On February 19, 2008, Fintics was admitted to the hospital
17 with suicidal ideation.  He had quit taking his medications two
18 weeks earlier "because he thought the lithium was causing him to be
19 more passive." A.R. 834.  He stated his significant depression had
20 continued despite taking lithium and increasing his Zoloft dosage,
21 so he stopped taking his medications.  He subsequently felt "more
22 depressed, more hopeless," and ultimately suicidal.  He drank about
23 twelve beers, felt worse, and went to the hospital.  *Id.*  He denied
24 any regular alcohol use since his last hospitalization until two
25 nights before going to the ER.  He stated his biggest problem was
26 his low energy level and lack of interest in doing anything.  He
27 was diagnosed with "Bipolar affective disorder, depressed phase,"
28 and "Alcohol abuse," and his GAF upon admission was estimated at

18 - MEMORANDUM OPINION AND ORDER

1  50.  A.R. 836.  He was treated inpatient until February 25, 2008.
2  Upon discharge, his diagnoses had not changed, but his GAF had
3  risen to 70.  A.R. 838.  He was willing to try Wellbutrin again,
4  and the attending physician prescribed Wellbutrin XL 150 mg in the
5  morning, noting he might try adding Paxil later.  He also
6  prescribed trazodone to help Fintics sleep.  A.R. 840.  When
7  Fintics was discharged, he stated he probably would not continue
8  taking the lithium, despite how bad his condition was upon
9  admission.  However, he agreed to continue taking Wellbutrin.
10  A.R. 841.

11      On March 6, 2008, Fintics saw NP Burckhardt for followup after
12  his hospitalization.  He was not taking the Wellbutrin that had
13  been prescribed for him upon hospital discharge.  He was not
14  drinking or smoking.  He wanted to see a counselor, and was given
15  information on low-income sliding-scale counseling services.
16  A.R. 1359.

17      Fintics saw Dr. Bajaj on March 20, 2008, for followup of his
18  lower extremity edema, hypertension, acute upper respiratory tract
19  infection, and questions about his health and wellness and diet.
20  He was wearing his compression stockings regularly, but was not
21  using them on this date.  His edema had "improved markedly."
22  A.R. 1355.

23      On April 4, 2008, Fintics saw counselor Eryn Joyce regarding
24  symptoms of depression with mood swings, loss of motivation and
25  drive, low energy and anhedonia.  He was taking Trazodone two to
26  three times daily, which was helping him feel "marginally better."
27  A.R. 1353.  He had been clean and sober for two months.  He "was
28

19 - MEMORANDUM OPINION AND ORDER

given some skill training in using cognitive strategies," and agreed to talk with Dr. Bajaj about medication strategies. *Id.*

On April 30, 2008, Fintics saw Dr. Bajaj for followup of chronic sinusitis, allergic rhinitis, and bilateral lower extremity edema. His edema had improved. He was still wearing compression stockings. He was not drinking. A.R. 1350-51.

Fintics saw Dr. Bajaj on June 6, 2008, stating he had been hospitalized recently for five days "on a psychiatric hold after a very strong suicidal ideation." A.R. 1348. He stated he had become severely depressed and suicidal after a drinking binge. He had severe DTs, and was kept on medical detox during his hospitalization. After his release, he resumed going to AA meetings, and he denied current drinking. Fintics agreed to follow up with NP Burckhardt for counseling. He was resistant to the idea of an updated alcohol and drug assessment. A.R. 1349.

On June 10, 2008, Fintics saw Dr. Bajaj for followup of "Recent suicidal ideation," sleeplessness, hypertension, and "Nicotine cravings." A.R. 1346. His sleep was improving gradually and becoming more restful. He was taking Benadryl 25 mg, one or two at bedtime; melatonin; and a Chinese herbal preparation for his sleep and mood. *Id.*

On June 12, 2008, Fintics had a counseling session with NP Burckhardt regarding his depression. His depression had been improving somewhat, but he had been "feeling more depressed in the last few weeks." A.R. 1345. He felt good after his mother came for a visit, but after she left, he "crashed" and "began drinking which made him feel very sick." *Id.* He had DTs when he stopped drinking and spent several days in the hospital. He had not been

20 - MEMORANDUM OPINION AND ORDER

drinking since his discharge. "He would like to do some part time work." *Id.* His primary complaint at this visit was his chronic back pain which was interfering with his sleep, leading to more depression. NP Burckhardt's assessment, based on the symptoms Fintics reported over the last several weeks, was "bipolar I, last depressed, now with mild symptoms that are going into remission." *Id.* She noted, "The abstinence from alcohol, I think, is making an impact on these symptoms." *Id.*

Fintics saw NP Burckhardt for followup on June 26, 2008, regarding "substantial depression feelings." A.R. 1344. Fintics stated he had days when he had hard a time getting out of bed and felt deeply depressed. He would force himself out of bed, was "attending two to three AA meetings a day," and stated he was "not giving up." *Id.* His sleep was poor, as he was waking up every two to four hours with back pain. Sometimes he could go back to sleep, but then he might sleep well into the day, throwing his schedule off and making him feel even more depressed. NP Burckhardt's assessment was "Bipolar I with depression that is currently mild," and "Alcohol abuse that is currently in remission." *Id.*

Fintics saw Dr. Bajaj on July 1, 2008, for followup of several medical problems. Fintics "complain[ed] of nearly continual and ongoing low back pain that is chronic in nature. We have evaluated this in the past with plain film imaging dated 1/19/07 and he does have moderate to severe degenerative disc disease of the L5-S1 level with osteophyte formation." A.R. 1342. Fintics was directed to return in a week or two "to attempt to perform physiotherapy treatment and consult with him further about pain management." A.R. 1343.

21 - MEMORANDUM OPINION AND ORDER

On July 9, 2008, Fintics saw Dr. Bajaj for followup of his chronic low back pain and hypertension. Notes indicate an x-ray "performed over a year ago was remarkable for significant degenerative changes of the lumbosacral spine," but at that time, Fintics was not willing to pursue prescription pain medications. A.R. 1340. He was getting acupuncture "and other conservative measures" to address his pain, but these had not been effective. He stated his back pain was affecting his sleep quality, and he was awakening often at night from the pain. He had been taking ibuprofen without relief. He noted that in the past, he had taken prescription pain medications, but even those only provided him with temporary relief. "Mr. Fintics describes his pain as primarily focal in the midlumbar to upper sacral region, but he also notes that he will have radicular pains into the right and left upper extremities, which can present bilaterally at times." *Id.* They discussed various therapies, and began reviewing the clinic's pain contract. Fintics was resistant to "the idea of having periodic urine drug and alcohol screens performed." A.R. 1341.

On July 10, 2008, Fintics saw NP Burckhardt for medication management. He complained of excessive fatigue and feeling "wiped out," and stated on some days, he did not want to get out of bed. This was upsetting to him because in the past, he had relapsed on alcohol when he felt that way. He questioned whether a stimulant would help him, noting a friend was taking stimulants for his fatigue. Fintics looked "very tired," and he was "quite irritable" and "quite negative." A.R. 1339. His assessment was "Bipolar I with increasingly prominent depressive symptoms of fatigue, irritability, negative talk, feelings of hopelessness, suicidal thoughts

but no intent or plan, and lack of motivation." *Id.* He was "unwilling to discuss the possibility of trying a different antidepressant." *Id.* NP Burckhardt declined to prescribe a stimulant. She recommended he discuss his pain problems with Dr. Bajaj, "and also discuss any Chinese herbs or other [treatments] he believes are more natural remedies for his fatigue." *Id.*

Fintics saw Dr. Bajaj on July 16, 2008, for followup of his chronic pain syndrome and low back pain. Notes indicate he was seeing the doctor to follow up "on a plan to initiate chronic pain management." A.R. 1338. He had been using ibuprofen 800 mg three times daily, which was irritating his digestive system without really helping his back pain. They reviewed and completed a controlled substance contract, and the doctor prescribed an initial dosage of hydrocodone 325 mg, one to two tablets in the evening. *Id.* Fintics also was encouraged "to continue to utilize acupuncture as part of his pain management plan," and the doctor suggested physical therapy also might be an option. *Id.*

On August 21, 2008, Fintics was seen in the ER with complaints of suicidal ideation and alcohol abuse. With reference to his level of intoxication, the record states "alcohol level 97."[2] He stated he had been hospitalized for eleven days in December 2007, for suicidal ideation, and took lithium, Wellbutrin, and Zoloft for about a month after his discharge, but he had not taken any psychotropic medications since that time. He reported on-and-off chronic alcohol use, with recent consumption of "a case of beer

---

[2]No explanation is offered of the units of measurement and how the sample was taken and analyzed.

23 - MEMORANDUM OPINION AND ORDER

a day." A.R. 744, 745. He had "been looking for chemical dependency treatment over the past month," and stated things had "gotten so out of control for him" that he had gone to a bridge and considered jumping off. A.R. 744. Instead, he called a crisis line, and ended up going to the ER by cab. He complained of "continued suicidal ideations due to his uncontrolled drinking," stating he felt helpless and hopeless. *Id.* He had a low energy level, "no focus," and was not enjoying life. *Id.* He was transferred to the psychiatric unit for treatment. Although he had a past diagnosis of bipolar disorder, he presented "more with depressive symptoms," A.R. 746, and doctors could not "totally rule out whether he has bipolar disorder currently presenting in a depressed state." A.R. 747. He was noted to have poor hygiene and grooming; soft, monotonous speech; an anxious affect; and depressed mood. *Id.* His attention span and concentration were "mildly impaired," and his insight and judgment were "limited." *Id.* He was diagnosed with "Depressive disorder, not otherwise specified, alcohol dependence. Rule out bipolar disorder in a depressed state." *Id.*

Fintics remained hospitalized, receiving detoxification treatment and psychiatric treatment, until September 2, 2008. While in the hospital, he had no acute complications from alcohol withdrawal. He was noted to be "likely suffering from significant major depression, although this was difficult to distinguish from effects due to alcohol dependence." A.R. 739. He refused anti-depressant medications. By the time of his discharge, he was fully detoxified from alcohol, but his prognosis for relapse was guarded due to his lack of a support system and uncertainty regarding his

24 - MEMORANDUM OPINION AND ORDER

housing situation.  A.R. 739-40.  His Axis I discharge diagnoses
were "Depressive disorder, not otherwise specified; alcohol
dependence; rule out bipolar disorder, depressed."  A.R. 739.

On September 10, 2008, Fintics saw Dr. Bajaj for followup
after his hospitalization.  Fintics told the doctor that prior to
his hospitalization, he was "feeling quite overwhelmed and
pressured and . . . that his back pain [had] been quite
bothersome."  A.R. 1336.  He stated "the whole process for chronic
pain management including the requirements for the controlled
substance contract is quite distressing to him . . . [and] caused
him to relapse on alcohol . . . [which] eventually led him to
feeling quite suicidal again and eventually hospitalized and
evaluated at Providence St. Vincent's."  *Id.*  Although hydrocodone
had been prescribed for his chronic neck and low back pain, Fintics
had only started the medication three days earlier because he had
not had money to pay for the prescription.  He had located a church
organization that now was helping him pay for his medications, and
he had filled the prescription three days earlier.  He had neck
pain with limited range of motion, especially on flexion and
extension, and the pain was affecting his ability to sleep.  He
also had occasional tension headaches.  On examination, the doctor
noted "significant cervical spinalis muscle tension and bilateral
upper trapezial muscle tension," as well as reduced ranges of
motion of the neck.  An MRI of Fintics's cervical spine was
ordered.  The doctor prescribed hydrocodone 500 mg, one in the
morning and two at night.  He noted Fintics had limited resources,
but Fintics was "resistant to using more affordable methods such as
methadone."  A.R. 1337.

On September 23, 2008, Fintics saw Dr. Bajaj for followup of chronic back pain.   The doctor noted Fintics would benefit most from weight reduction.   He prescribed hydrocodone 500 mg, one every eight hours as needed for pain.   A.R. 1334-35.

On October 9, 2008, Fintics saw NP Burckhardt to reestablish care with her.   He was "in remission from alcohol abuse," and his major depressive disorder also was noted to be "in partial remission."   A.R. 1332.

On October 22, 2008, Fintics received a refill of hydrocodone, 500 mg, to be taken every five hours as needed for pain. A.R. 1313.

Fintics saw NP Burckhardt on November 6, 2008, for followup of his depression.   Notes indicate his major depressive disorder was "in remission at this point."   A.R. 1330.

On November 12, 2008, Fintics saw Dr. Bajaj for followup of his low back pain.   Fintics stated he was "attempting to be more physically active in an effort to reduce his body weight," and this was causing him increased back pain.   His hydrocodone was increased to 500 mg, one to two every eight hours.   A.R. 1329.

On November 19, 2008, Fintics saw Dr. Bajaj for followup of "ongoing neck pain" and low back/pelvic pain.   An MRI had been obtained on October 7, 2008, and it was "essentially unremarkable," showing "some mild cervical spine straightening," but well-preserved disks and no evidence of stenosis.   A.R. 1325.   The doctor opined the neck pain was due to muscle tension, and he urged Fintics to do some stretching exercises.   Regarding his ongoing low back pain, x-rays had been taken of his lumbosacral spine.   "The results showed moderate degeneration, but no stenosis."   *Id.*   The

26 - MEMORANDUM OPINION AND ORDER

doctor ordered x-rays of his pelvis and hips bilaterally to rule out other causes for Fintics's back pain.  A.R. 1326.

On December 10, 2008, Fintics saw Dr. Bajaj for followup of his chronic pain syndrome.  Hydrocodone was prescribed, 500 mg every six to eight hours.  A.R. 1323.

On January 3, 2009, Fintics was seen in the ER for flu-like symptoms.  There is no indication in treatment notes that he was intoxicated.  He was noted to be "awake, alert, non-ill appearing." A.R. 732.

On January 16, 2009, Fintics saw Dr. Bajaj for followup of "right flank pain" that started in December 2008, "after a bout of binge drinking."  A.R. 1316.  He denied drinking recently, and his alcoholism was noted to be "in remission."  A.R. 1316.  The same day, he saw NP Burckhardt.  She had not seen him for about three months, and Fintics was reporting back to her on his progress with depression.  He had stayed sober over the holidays and felt he had made good progress.  She noted he was "very pleasant and happy today in a way that I have not seen him before.  He is very clear in his thinking.  His mood is very positive[.]"  A.R. 1317.

Fintics saw Dr. Bajaj on January 9, 2009, for followup of respiratory infection, chronic low back pain, hypertension, and "bipolar disorder with depression."  A.R. 1318.  He was not being treated with medication for the bipolar disorder, but was seeing "a mental health provider, Carol Burckhardt, on a regular basis." *Id.* His depression had worsened somewhat due to his respiratory ill- ness, but he had been able to refrain from drinking.  *Id.*

On February 6, 2009, Fintics saw Dr. Bajaj for routine pain management for his chronic pain syndrome.  He was using hydrocodone

27 - MEMORANDUM OPINION AND ORDER

1 500 mg every eight hours.  The prescription was to be refilled as
2 soon as results came back from a routine drug screen.  A.R. 1313.

3     Fintics saw Dr. Bajaj for followup on February 24, 2009.
4 Notes indicate he had been taking "a judicious amount of hydro-
5 codone" for his chronic back pain.  A urine drug screen was
6 negative for hydrocodone, which Fintics stated he was taking as
7 prescribed.  A.R. 1310.

8     On March 6, 2009, Fintics saw Dr. Bajaj for followup of
9 chronic pain syndrome with degenerative joint disease of the
10 cervical spine and chronic low back pain.  He requested a refill of
11 his hydrocodone, which the doctor provided.  A.R. 1309.

12     On April 14, 2009, Fintics saw Dr. Bajaj for followup of a
13 recent alcohol relapse.  He had been hospitalized at OHSU on
14 March 30, 2009, after relapsing and binging on alcohol.  He was
15 kept on psychiatric hold for two days, but had been sober since his
16 discharge.  Subsequent to his discharge, he had developed a
17 respiratory tract infection that the doctor feared had worsened
18 into pneumonia, and Fintics was treated with antibiotics.  Fintics
19 requested a refill of hydrocodone for his chronic low back pain.
20 The doctor noted Fintics "has used up to #120 per month as part of
21 his pain management.  There are two areas of concern here; he has
22 resumed drinking and when he drinks, he has been drinking quite
23 heavily which is a strong contraindication for continuation of his
24 medication, and secondarily are his continued complaints with pain
25 management plan."  A.R. 1305.  Fintics "insisted" he did not need
26 a referral for an alcohol and drug assessment.  *Id.*  The doctor
27 told Fintics his concerns about Fintics's "ability to responsibly
28 use prescription-controlled substances.  Mr. Fintics verbalize[d]

28 - MEMORANDUM OPINION AND ORDER

to [the doctor] that he intend[ed] to continue with alcohol [abstinence,] and he . . . also declin[ed] an opportunity for an updated alcohol and drug assessment." A.R. 1306. Noting Fintics was scheduled for followup with his mental health provider later in the week, the doctor "did provide him with a refill of his hydrocodone," prescribing one to two every eight hours as needed for back pain. *Id.*

On April 30, 2009, Fintics saw NP Burckhardt for followup of his depression, after not seeing her for several months. He stated he was "struggling with depression," and felt it had worsened "since he got a Section 8 Voucher and moved to new housing . . . in North Portland where . . . he feels very alone and isolated . . . [and] is not sleeping well." A.R. 1304. He stated his depression was as bad as it had ever been. He admitted to drinking "back in March," and being "in psych ER at least twice." *Id.* He refused any psychotropic medications, saying he had "tried all antidepressants and that none of them worked for him." *Id.* He was not open to any type of counseling, stating he had nothing to say. *Id.*

On May 9, 2009, Fintics was admitted to St. Vincent Hospital with the following complaints:

> This patient is a 45-year-old Caucasian male with a past history of psychiatric hospitalization for chronic depression, who presented with a chief complaint of "I need to get myself straightened out." He stated that depression became worse towards the end of winter and resulted in a relapse on alcohol. Since that time, he has been drinking close to a case of beer per day. As his drinking became worse, he started getting increasingly more depressed and became suicidal, with a plan to jump off of a bridge. He was otherwise found to be generally medically stable in

29 - MEMORANDUM OPINION AND ORDER

1           the emergency department but was felt to be at
2           risk for complicated alcohol withdrawal.  He
              was transferred to [the psychiatric service]
3           on a voluntary basis for further safety, in
              light of suicidal ideation, and for medical
4           detoxification from alcohol.

5 A.R. 482.  Fintics's diagnoses on admission were "Axis I:

6 Depressive disorder, not otherwise specified.  Alcohol dependence,

7 rule out substance-induced mood disorder, rule out posttraumatic

8 stress disorder"; and his GAF was estimated at 25.  *Id.*

9    Fintics remained in the hospital until May 20, 2009.  He was

10 treated for alcohol withdrawal and detoxification, and then the

11 staff tackled the "challenge" of clarifying his diagnosis.  His

12 treating physician noted the following in Fintics's discharge

13 summary:

14           This patient does present with a very long-
              standing history of depression.  His symptoms
15           were suggestive of possible major depressive
              disorder, though this was felt to be compli-
16           cated by ongoing alcohol dependence. After he
              detoxified from alcohol, his mood seemed to
17           brighten considerably and his overall concen-
              tration and ability to interact improved.
18           Anxiety continued to be a problem but did seem
              to be significantly less towards the latter
19           part of his hospital stay.  After he did
              detoxify from alcohol, he did provide a
20           history that seemed to be much more suggestive
              of dysthymic disorder, which carries a much
21           less favorable prognosis in terms of respond-
              ing to antidepressant treatment.  I did spend
22           time reviewing this with him. Ultimately, he
              did not start an antidepressant due to his
23           past experience of not tolerating anti-
              depressants and feeling that they do not offer
24           any benefit.  He felt that antidepressants
              suck out his soul. Consequently, Vistaril and
25           Zyprexa were used as needed for breakthrough
              agitation and anxiety. As his hospitalization
26           progressed, he required less of this
              medication.  Ultimately, I wondered to what
27           extent there is a personality disorder
              component that tends to drive his depression.
28           There does seem to be a very passive and

30 - MEMORANDUM OPINION AND ORDER

1          dependent quality, as he does have a history
2          of failing to follow through with basic
           accountability, given resources and other
3          individuals willing to help him. This was
           talked about and reenforced. However, it
4          remains unclear to what extent he is motivated
           to take care of himself following discharge in
5          this regard.

6  A.R. 483.

7      Fintics "declined a referral to primary chemical dependency

8  treatment, stating he felt his needs related to more individual

9  therapy." *Id.* He was advised that if he relapsed again,

10  especially in a short period of time, that would be evidence that

11  he needed more long-term chemical dependency treatment. His

12  prognosis for maintaining sobriety over the long term was "felt to

13  be fairly low at this time." *Id.* He was encouraged to follow

14  through with Old Town Clinic, where an "umbrella set of resources"

15  was available to assist him, and a follow-up appointment was

16  scheduled with his therapist there. *Id.*; A.R. 503. His Axis I

17  discharge diagnoses were "Depressive disorder, not otherwise

18  specified, alcohol dependence, rule out alcohol induced mood

19  disorder, rule out dysthymic disorder, rule out posttraumatic

20  stress disorder," and his current GAF was estimated at 50.

21  A.R. 482.

22      On May 21, 2009, the day after his hospital discharge, Fintics

23  saw counselor Eryn Joyce for followup of his alcohol relapse "and

24  chronic bipolar depression." A.R. 1300. He had 45 minutes of

25  individual assessment and "rapport building." *Id.*

26      On May 22, 2009, Fintics saw NP Burckhardt for medication

27  management. Fintics agreed to use his medications instead of

28

31 - MEMORANDUM OPINION AND ORDER

1  alcohol, and to see counselor Joyce every two weeks for counseling.
2  A.R. 1301.

3      On May 29, 2009, Fintics saw Dr. Bajaj with complaints of
4  right ankle pain and a recent strain/sprain of his right ankle.
5  Fintics had been using an increased dose of hydrocodone due to his
6  ankle pain.   He asked to be switched to oxycodone because the
7  hydrocodone was costing his church $200 per month, and oxycodone
8  was cheaper.   This request was denied.   He also had been taking
9  Ibuprofen 600 mg two to three times daily, and he was told to
10 continue that as needed, and also to use ice and stay off his ankle
11 as much as possible for several days.   His diagnoses included
12 "Right ankle sprain;/strain with right foot pain"; "Chronic
13 degenerative low back pain;' and "Alcohol dependence.   This is in
14 remission."   A.R. 1298.

15     On June 3, 2009, Fintics saw counselor Joyce, stating he
16 needed "to be back in the hospital for two months on heavy meds."
17 A.R. 1297.   He had stayed in bed for the past three days without
18 eating.  He complained of "stomach anxiety, no motivation or drive,
19 intermittent thoughts of suicide, [and] confusion."   *Id.*   He had
20 run out of his medications two days earlier, but stated they were
21 not very effective anyway.   He stated "he had eight months of being
22 clean and sober up until the last two months."   *Id.*   He presented
23 with "symptoms of both dysthymia and a bipolar disorder with rapid
24 cycling."   *Id.*   He was diagnosed with bipolar I, PTSD, alcohol
25 dependence, rule out delusional disorder.   *Id.*

26     On June 10, 2009, Fintics was admitted to the hospital when he
27 went to the emergency room and stated he had been "feeling suicidal
28 for about a week."   A.R. 464.   He described "an idea that he might

32 - MEMORANDUM OPINION AND ORDER

1  jump off a bridge." *Id.*  He had consumed twelve beers that day.
2  Notes indicate he had been admitted to the hospital "several times"
3  previously for depression, the last time just a month earlier.  He
4  was noted to be "heavily intoxicated," with an "alcohol level of
5  332," and the admitting physician indicated Fintics's chief problem
6  seemed to be related to his alcohol consumption.  *Id.*  He was too
7  intoxicated for much evaluation, and he was admitted and kept until
8  he sobered up enough for evaluation.   He was admitted "for
9  psychiatric concerns," with diagnoses of depression, suicidal
10 ideation, and alcohol dependence/intoxication.  A.R. 465.

11     The next day, Fintics still felt suicidal and was "starting to
12 have some withdrawal symptoms." *Id.*  He stated he had been dis-
13 charged from the hospital a few weeks earlier without any anti-
14 depressant medications.  He "continued to see things getting worse
15 so [he] started drinking[.]" A.R. 467.  His affect was noted to be
16 blunt, and he was angry, irritable, and had a depressed mood.  He
17 also was feeling "very bad physically." *Id.*  He was given Ativan
18 for his withdrawal symptoms, A.R. 479, and "2 Vicodin for his
19 chronic back pain as he [said] that he receive[d] 2 Vicodin every
20 6 hours routinely." A.R. 466.

21     On June 13, 2009, while still in the hospital, Fintics
22 developed "a gradually increasing crampy epigastric bilateral upper
23 quadrant abdominal pain associated with nausea and dry heaving."
24 A.R. 987.  Fintics related having similar pain in the past but
25 never as severe.  He was diagnosed with "Pancreatitis, most likely
26 secondary to alcohol." A.R. 988.  A CT scan and lab tests were
27 scheduled to rule out other causes for his abdominal pain. *Id.*
28 The CT scan, performed on June 14, 2009, "showed evidence of

33 - MEMORANDUM OPINION AND ORDER

1   pancreatitis," but otherwise was essentially a "negative test."
2   A.R. 1120; *see* A.R. 1139-40.   Fintics was discharged from the
3   hospital on June 16, 2009, with primary diagnoses of alcohol-
4   induced pancreatitis, alcohol dependence, depression with suicidal
5   ideation, and hypomagnesemia; and secondary diagnoses of hyperten-
6   sion, reactive airway disease (asthma), gastritis, glucose intoler-
7   ance, and mild hypertriglyceridemia.   *Id.*

8      Later that day (June 16, 2009), Fintics was taken to the ER by
9   his pastor.   Notes indicate Fintics had "relapsed on alcohol over
10  the past week and began feeling increasingly depressed and
11  suicidal."   A.R. 974.   His blood alcohol level was 332.   He was
12  suicidal, stating he planned to jump off a bridge.   This was noted
13  to be "consistent with past stated plans when he has felt
14  suicidal."   *Id.*   He was transferred to the psychiatric ward, where
15  he was treated until June 23, 2009.   His GAF at the time of
16  admission was 40, and at the time of discharge was 52.   At the time
17  of discharge, Fintics stated he was "trying to think hopeful
18  thoughts," but "his depression stuff, in his words, was too severe
19  for him to just go to work."   A.R. 976.   Fintics acknowledged the
20  importance of staying sober due to "a serious risk of causing
21  further damage to his pancreas."   *Id.*   His affect remained
22  "generally flat and mildly depressed," but he was not tearful or
23  agitated, and his suicide risk was felt to be low, as long as he
24  remained abstinent from alcohol.   *Id.*

25     On June 26, 2009, Fintics saw Dr. Bajaj "as an urgent walk-in
26  double book appointment," for medical followup after his recent
27  alcohol relapse and hospitalization.   Fintics had started drinking
28  again just a short time after his hospital discharge, and stated he

34 - MEMORANDUM OPINION AND ORDER

had "consumed two cases of beer in the past three days," with his last drink early that morning. A.R. 1296. He had visible, "very prominent tremors," and had not eaten anything that day. *Id.* He was diagnosed with acute alcohol intoxication, and hypertension. He was monitored in the clinic during the day, and arrangements were made for him to stay "in a SAFE passage bed overnight," and then be transported to "Hooper Detox" the next morning for admission to "an inpatient chemical dependency treatment program such as DePaul" upon his release from detox. *Id.*

On July 10, 2009, Fintics was seen in the ER for "Depression with suicidal ideation." A.R. 930. Fintics had been drinking and felt "as though there was no way out." *Id.* He stated he had not had any alcohol in 24 hours, and this was confirmed with lab tests showing "blood alcohol level less than 10."[3] He was noted to "have a flat affect" and he appeared "sad," and "a little bit aggressive in demeanor" at times. A.R. 931. Hospital records showed an earlier CT scan had showed "minimal residual inflammatory changes of the left upper abdomen from recent episode of pancreatitis and fat filled right inguinal hernia," with "no acute pathology noted." A.R. 930. His admitting Axis I diagnoses included "Depression with suicidal ideation. Alcohol abuse. Left upper quadrant pain secondary to a previous episode of pancreatitis. Hypertension. Pending thyroid studies for hypothyroidism." A.R. 931.

Fintics was admitted to the hospital and requested inpatient substance abuse treatment. A physician who saw him on July 12, 2009, noted several discrepancies between the history Fintics had

---

[3]Again, the record is silent on the units of measurement referred to here, and how the sample was taken and analyzed.

35 - MEMORANDUM OPINION AND ORDER

given upon admission and his previous records.  The doctor noted
Fintics had told the ER staff that he had lost his apartment the
previous day, but he actually had lost his apartment two weeks
earlier.  In addition, the doctor noted Fintics's "initial suicidal
plan of, 'I'm going to jump off a bridge,' ha[d] been a complaint
since 2008, and he ha[d] a history of chronic suicidal ideation."
A.R. 932.  The doctor indicated Fintics was "an unfortunate 45-
year-old man with alcohol dependence and depression, not otherwise
specified, likely related to his alcohol use, who has chronic
stable complaints of suicidal ideation with a reported plan to jump
off of a bridge."  A.R. 932-33.  He had been homeless repeatedly
throughout his life, largely due to his alcoholism.  Although
Fintics was noted to be "proactive about seeking treatment for pain
and suicidal ideation in emergency room settings," he did not carry
through well with inpatient treatment programs, failing to attend
groups or follow recommendations upon discharge.  Doctors observed
that Fintics was not in any particular psychic distress and
appeared "quite comfortable," and he was discharged.  A.R. 932-33.
The doctor's discharge notes are illuminating:

> Mr. Fintics will be discharged today.  He has
> been given resources, lists of shelters,
> including TPI and Central Cit concern, which
> he has expressed some familiarity with.  He
> will be given bus ticket and, as I have
> discussed with him, my recommendation is that
> he access shelter services, maintain sobriety
> and continue to work as he has been on
> proactively calling [a] substance abuse
> treatment organization to get on to the
> waiting list for inpatient hospitalization.  I
> also recommended to him attending AA meetings,
> which it seems he has not, for the most part,
> been doing for many months.  In the end, I
> think his motivation is a limiting factor.
> However, there are not severe corroborating
> signs of depression to suggest that this is

36 - MEMORANDUM OPINION AND ORDER

1          due to a mental illness.  Rather, it seems he
2          is indolent about sobriety.  Thus, it seems
           perfectly appropriate and recommended for him
3          to take a more proactive role in obtaining the
           substance abuse treatment services, which he
4          feels he needs.  Our previous conversations
           have shown that he will reject recommendations
5          for treatments that he does not feel he needs,
           including outpatient substance abuse treatment
6          and further involvement at this time with AA
           without inpatient treatment.

7  A.R. 933.

8      On August 6, 2009, Fintics saw NP Burckhardt "to ask about

9  getting some paperwork done for his attorney."  A.R. 1295.  He

10 stated he had been hospitalized several times, and he was feeling

11 "very alone, anxious, and upset because of his living situation."

12 *Id.*  He was unwilling to try antidepressants or anti-anxiety

13 medications, feeling they made his depression and anxiety worse.

14 He was noted to be "visibly anxious and upset . . . with many

15 expressions of hopelessness and helplessness[.]"  *Id.*  NP

16 Burckhardt's diagnosis was "Bipolar I with severe depressive

17 symptoms, nonpsychotic."  *Id.*

18     On August 7, 2009, NP Burckhardt completed a questionnaire

19 submitted to her by Fintics's attorney.  On the questionnaire, she

20 indicated she had been seeing Fintics since January 2007.  She saw

21 him four times in 2007, ten times in 2008, and four times in 2009.

22 His current diagnoses were listed as "Bipolar Disorder, Dysthymia,

23 and Depression NOS."  A.R. 1403.  She noted that despite Fintics's

24 abusive childhood, she had not diagnosed with him PTSD.  A.R. 1404.

25 She indicated that although the usual treatment for his conditions

26 would be mood stabilizing medications, Fintics had declined any

27 medications and had been unable to participate in cognitive

28 therapy.  A.R. 1403-04.  She listed his symptoms as "severe

37 - MEMORANDUM OPINION AND ORDER

1  depression, anhedonia, lack of energy, [and] excessive negative
2  feelings." A.R. 1404. She did not opine Fintics suffered from an
3  anxiety disorder, believing instead that his anxiety was related to
4  his untreated bipolar disorder and "periodic excessive use of
5  alcohol." *Id.*

6      NP Burckhardt indicated Fintics's concentration, persistence,
7  and pace are limited by his impairments. She cited, as examples,
8  his failure to keep regular appointments, and failure to carry out
9  any type of plans. A.R. 1405. She opined Fintics's impairments
10 would affect his activities of daily living to a mild degree, and
11 noted he sometimes presented "in a disheveled manner." *Id.*
12 Regarding his mental residual functional capacity ("RFC"), she
13 opined Fintics would be moderately limited in his ability to accept
14 instructions and respond appropriately to criticism from super-
15 visors, and to maintain socially appropriate behavior and adhere to
16 basic standard of neatness and cleanliness. She opined he would be
17 markedly limited in his ability to maintain attention and concen-
18 tration for extended periods; perform activities within a schedule,
19 maintain regular attendance, and be punctual within customary
20 tolerances; sustain an ordinary routine without special supervi-
21 sion; complete a normal workday and workweek without interruption
22 from psychologically-based symptoms; and perform at a consistent
23 pace without an unreasonable number and length of rest periods.
24 She was unable to provide an opinion on Fintics's ability to
25 interact appropriately with the general public, get along with
26 coworkers or peers without distracting them or exhibiting extreme
27 behaviors, respond appropriately to changes in the work setting, or
28

38 - MEMORANDUM OPINION AND ORDER

work in coordination with or proximity to others without being distracted by them. A.R. 1406.

On August 7, 2009, Dr. Bajaj completed a questionnaire provided by Fintics's attorney. A.R. 456-60. He noted he had been treating Fintics since November 2006, and over time, Fintics had been diagnosed with chronic degenerative back pain; major depressive disorder; bipolar disorder; suicidal ideation; hypertension; hyperlipidemia; morbid obesity; and chronic alcoholism. As a result of these conditions, he stated Fintics experiences suicidal behavior and ideation, chronic pain syndrome; obsessive, negative thinking; and low self esteem. A.R. 456. He estimated Fintics's pain level to be 7 to 8 on a 10-point scale, and his fatigue to be 8/10. A.R. 456-57.

Dr. Bajaj estimated Fintics would be unable to carry any amount of weight, either occasionally or frequently. He opined Fintics could stand and/or walk for no more than fifteen minutes before he would need to sit and rest; stand and/or walk for a total of only one-half hour in an eight-hour day; six for one to two hours, total, with normal breaks; and he would have only a limited ability to push or pull due to aggravation of his mid-low back pain. A.R. 457. He opined Fintics would have no deficits in feeling (skin receptors); he could engage in kneeling, crouching, crawling, handling (gross manipulation), and fingering (fine manipulation) occasionally; and he never should climb, balance, stoop/bend, or reach overhead. *Id.*

In Dr. Bajaj's judgment, Fintics suffers from major depression with suicidal ideation, characterized by anhedonia, appetite disturbance with weight change, sleep disturbance, decreased

39 - MEMORANDUM OPINION AND ORDER

energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking.  A.R. 458.  He also stated Fintics suffers from a generalized, persistent anxiety disorder evidenced by apprehensive expectation, autonomic hyperactivity, recurrent severe panic attacks, and recurrent obsessions or compulsions.  He stated Fintics has obsessive thinking, "untreated bipolar disorder," and impulsive behavior followed by depressive "exhaustion."  *Id.*

Dr. Bajaj indicated Fintics's concentration, persistence, or pace are limited to an "extreme" degree by his medications and their side effects.  He opined Fintics has marked limitations in social functioning, and in his activities of daily living, due to his impairments and his medications.  Dr. Bajaj would expect Fintics to miss more than two days of work a month because of his impairments, symptoms, and medications.  He noted Fintics often missed scheduled appointments, and had poor compliance with prescriptions and treatment protocols.  He noted Fintics's "mental health, chemical dependency, and physical complaints have all worsened over the last six months," with "[f]our hospitalizations in the last two months alone."  A.R. 460.

## B.   Consultative Evaluations

Fintics underwent two consultative psychodiagnostic evaluations, one at the initial application stage and another at the reconsideration stage.

Duane D. Kolilis, Ph.D., a Licensed Psychologist, saw Fintics on August 29, 2006, for a psychodiagnostic evaluation at the request of the state agency.  A.R. 309-14.  He was with Fintics

40 - MEMORANDUM OPINION AND ORDER

"for approximately one hour during which time behavioral observa-
tions and a structured interview were conducted." A.R. 309. His
records review was limited to Fintics's hospitalization from
January 8 to January 11, 2006, and doctors' notes from January 28,
2004, to June 8, 2004. *Id.*

Fintics was noted to be 5'8" tall, with a weight of 270
pounds. "He spoke with an angry voice throughout and seldom made
eye contact. His responses were guarded, evasive, and vague, but
when he spoke about his mental health issues his statement appeared
rote and rehearsed." A.R. 311. Dr. Kolilis found Fintics to be an
unreliable historian. He noted Fintics sat throughout the inter-
view without evidence of discomfort or pain behavior, and his gait
and posture were unremarkable. *Id.*

Fintics stated when he is not drinking, his depression comes
and goes. He has anxiety, but he could not pinpoint any triggers,
stating "It's just there." He stated he has a "serious problem"
with concentration and staying focused. He solved simple
calculation problems quickly and accurately, easily calculating
"the number of nickels in $1.95." A.R. 312. He had good judgment,
and exhibited good abstract reasoning. *Id.*

Dr. Kolilis found Fintics's lack of pain behavior to be
inconsistent with his complaints of severe back pain. Fintics
stated he had done research on bipolar disorder, and many of his
responses were felt to be "rehearsed and rote." A.R. 313. The
doctor speculated that Fintics "most likely continues to abuse
narcotic pain medications as well as alcohol and marijuana.
Although he claimed today to have stopped marijuana in 2003, his
drug screen of 01/11/06 was positive for this drug." *Id.*

41 - MEMORANDUM OPINION AND ORDER

The doctor opined that if Fintics were clean and sober, there would be no psychological impairments that would prevent him from working.  His review of Fintics's medical records led him to conclude Fintics had "been quite manipulative in obtaining drugs." The doctor noted:

> [Fintics] alleged today that his hospitalization at Good Sam in January 2006 was for suicidal ideation, but a review of the records shows that he went to the ER for pain medications and threatened to jump off a bridge if he didn't get it.  After receiving Vicodin, he reportedly told staff that he had not been serious about the suicidal threats saying he loved the Lord too much to do that. Regarding the specific point to be covered in this examination of current suicidal ideation, it is the opinion that these threats have been manipulative to obtain sympathy and/or drugs and do not have substance.
>
> Regarding the specific point to be covered in this examination of a Bipolar Disorder, it is this examiner's opinion that there is no substantive evidence to support this disorder in the verified absence of substance abuse, and the most accurate diagnosis is an Unknown Substance-Related Disorder NOS.

*Id.*

Dr. Kolilis's Axis I diagnoses were "Unknown Substance-Related Disorder NOS," "Polysubstance Dependence," and "Rule Out . . . Malingering."  A.R. 314.  He estimated Fintics's GAF, both currently and in the past year, at 75.  *Id.*

On April 5, 2007, Fintics saw clinical psychologist M. John Givi, Psy.D. for a comprehensive psychodiagnostic examination at the request of the state agency.  A.R. 423-30.  Dr. Givi was specifically asked to evaluate Fintics with respect to possible diagnoses of depression, bipolar disorder, anxiety, PTSD, and a history of suicidal ideation.  A.R. 423.  He examined Fintics and

42 - MEMORANDUM OPINION AND ORDER

administered a Mental Status Examination, the "Wechsler Memory Scale-III (WMS-III, Orientation subtest only)," and "Wide Range Achievement Test-3 (WRAT-3, Reading subtest only)." *Id.* He specifically noted that many of his findings were based on Fintics's self-reporting regarding his history and symptoms. *Id.*

Dr. Givi reviewed Dr. Kolilis's report, but no other medical records. A.R. 424.

Fintics was asked about his primary symptoms and problems that prevent him from working. He responded, "I get overwhelmed real easy and get irritable, frustration [sic], and anxiety." A.R. 426. He described his daily activities, reporting that he gets up at 5:00 or 6:00 a.m., and goes to bed around 11:00 p.m. He is only able to sleep three to five hours before waking. He bathes four times weekly, eats two meals a day, and snacks. "He spends his time praying and reading," and "he has four close friends, three of whom he sees weekly." *Id.* He does not require assistance with any of his activities of daily living, and has no problems managing money. He lives on food stamps, health care and housing assis-tance. *Id.* Notably, Fintics was "unable to provide descriptions of his symptoms of alleged mental illness other than a superficial overview of general symptoms of that diagnosis." A.R. 427.

Dr. Givi found Fintics to be "an unreliable historian." A.R. 428. Fintics repeatedly stated during the interview that he was "manic," but "he showed no clinical signs and did not appear to be manic." A.R. 429. He "rambled some," but followed the questioning adequately. He stated he had used LSD and mushrooms as a teenager, but Dr. Givi noted 2006 medical records showed "cannabis and opioids in his urinalysis." *Id.*

43 - MEMORANDUM OPINION AND ORDER

Fintics's cognitive abilities were assessed in the Average range, with Low Average reading skills.    Dr. Givi's Axis I diagnoses were "Polysubstance Dependence," and "Malingering (Provisional)," with a current GAF estimated at 70.    A.R. 430.

Fintics underwent a consultative physical examination on August 29, 2006, by Leslie King, M.D.[4]    Dr. King noted Fintics's low back problems may never have been evaluated thoroughly.    She observed that Fintics had not been good "in terms of followup and it may be because he has been outside of the health care system." A.R. 318.    Fintics was able to get onto and off of the examination table without difficulty.    He "walked very slowly," but "did not appear in any acute distress."    A.R. 319.    He had some difficulty performing tandem heel and toe maneuvers, "particularly when he had to switch all of his weight onto one foot in the tandem gait.    It caused a light limp favoring the right.    He also slightly [held] his right back."    *Id.*

The doctor was unable to determine Fintics's range of motion of his hips due to his complaints of pain.    Flexion of his knee joints was "decreased to 120 degrees due to [Fintics's] large abdominal pannus[5] and poor effort."    A.R. 320.    His ranges of motion of his back were 30 degrees on flexion, extension, and lateral flexion[6], with "very poor effort."    A.R. 320.    His cervical

---

[4]Dr. King signed the examination report with an indication that she is board certified in surgery.    A.R. 321.

[5]The pannus is "a hanging 'apron' of excess abdominal skin left behind after massive weight loss."    *See, e.g.*, http://plasticsurgery.about.com/od/glossary/g/panniculectomy.htm.

[6]It is not clear from the doctor's report whether these
(continued...)

44 - MEMORANDUM OPINION AND ORDER

ranges of motion were 45 degrees on extension, flexion, and lateral bending, and 80 degrees on rotation.[7]   Fintics was unable to perform straight leg raising maneuvers "secondary to poor effort and subjective complaints of pain." *Id.* He had 5/5 grip strength, with no evidence of atrophy or weakness.

Dr. King reached the following conclusions from her examination of Fintics:

> The number of hours the claimant could be expected to stand and walk would be 4-6 hours with breaks.  He needs to get his back issues evaluated.
>
> He also needs to have his mental health issues addressed as any type of fatigue or pain symptoms could be worsened by severe untreated major depression.
>
> The number of hours the claimant could be expected to sit would be 6-8 hours with breaks.
>
> No use [sic] for assistance devices for ambu-lation at this point.
>
> He could lift and carry 10 pounds frequently and 20 pounds occasionally.  He would be limited by subjective complaints of pain.

---

[6](...continued)
results relate to Fintics's thoracic spine or lumbar spine.  The Oregon Department of Consumer and Business Services, Workers' Compensation Division has adopted norms established by the AMA Guides for spinal ranges of motion.  The values given here - 30 degrees for flexion, extension, and lateral flexion - seem closest to the accepted norms for thoracic ranges of motion; however, those generally are expressed in terms of flexion (with a norm of 50 degrees), and right and left rotation (each with a norm of 30 degrees).   *See* http://www.cbs.state.or.us/external/wcd/policy/bulletins/ab_index.html, forms 2278C, "Spinal (Cervical) Range of Motion"; 2278L, "Spinal (Lumbar) Range of Motion"; and 2278T ("Spinal (Thoracic) Range of Motion" (visited March 28, 2012).

[7]The accepted norms for cervical ranges of motion are flexion of 60 degrees, extension of 75 degrees, right and left lateral flexion of 45 degrees, and left and right rotation of 80 degrees.  *Id.*

45 - MEMORANDUM OPINION AND ORDER

> There would be some postural limitations on
> bending, stooping, and crouching, again
> limited by subjective complaints of pain and
> no manipulative or other fine motor limita-
> tions.
>
> It should be noted the claimant repeatedly
> stated his mental health complaints were his
> most severe and he was very pensive during the
> interview. This in fact may be more debili-
> tating for this claimant tha[n] his complaints
> of chronic back pain. . . .

A.R. 320-21.

## C.   Records Reviews by State Agency Consultants

On October 26, 2006, psychologist Paul Rethinger, Ph.D. reviewed the Record and completed a Psychiatric Review Technique form, A.R. 325-38. He found Fintics has an Affective Disorder Not Otherwise Specified, and a Substance Addiction Disorder. He opined these conditions would cause only mild limitations in Fintics's activities, social functioning, and ability to maintain concentra-tion, persistence or pace. Dr. Rethinger reviewed all of the medical evidence up to the time of his records review. He relied heavily on Dr. Kolilis's consultative evaluation, and concluded, "All indications are that this is a highly manipulative individual, as supported by Dr. Kolilis'[s] exam." A.R. 337.

Clinical psychologist Dorothy Jean Anderson, Ph.D. reviewed the record on April 17, 2007, and completed a Psychiatric Review Technique form, A.R. 432-45, and a Mental Residual Functional Capacity Assessment form, A.R. 446-49. Dr. Anderson found Fintics has an Affective Disorder consisting of a Depressive syndrome characterized by (a) "Anhedonia or pervasive loss of interest in almost all activities"; (b) "Decreased energy"; (c) Feelings of

46 - MEMORANDUM OPINION AND ORDER

1  guilt or worthlessness"; and (d) "Thoughts of suicide." A.R. 435.
2  She also found Fintics has a Substance Addiction Disorder.
3  A.R. 440. Dr. Anderson gave "considerable weight" to Dr. Kolilis's
4  conclusion that when Fintics "is clean and sober there are no
5  psychological impairments that would prevent his employment."
6  A.R. 444.

7      Dr. Anderson noted that although Fintics "certainly is not a
8  good historian or reporter of his problems," a third-party reporter
9  sees Fintics "as fairly depressed and nonfunctional," noting he
10 tends to "run on" when he talks, has frequent suicidal thoughts,
11 does not think straight, and stays in bed much of the time when he
12 is depressed. Dr. Anderson stated, "Although both Kolilis and Givi
13 downplay impact of illness on this man's function in their GAF
14 assessments, I see that he has been mandated into drug and alcohol
15 treatment several times. His poor insight and judgment do appear
16 to be more [likely] than not severe in impact." *Id.*

17     Dr. Anderson believed a Mental RFC assessment was necessary.
18 In performing such an assessment, she opined Fintics would be
19 moderately limited in his ability to carry out detailed
20 instructions, maintain attention and concentration for extended
21 periods, interact appropriately with the general public, respond
22 appropriately to changes in the work setting, be aware of normal
23 hazards and take appropriate precautions, and set realistic goals
24 or make plans independently of others. A.R. 446-47. She otherwise
25 found he would not be significantly limited in work-related
26 functional abilities due to his mental impairments. *Id.*

27     From a physical standpoint, Martin B. Lahr, M.D., a pedia-
28 trician, reviewed the record on October 24, 2006, and completed a

47 - MEMORANDUM OPINION AND ORDER

Physical Residual Functional Capacity Assessment form.  A.R. 339-
46.  He opined Fintics would be able to lift and/or carry up to
twenty pounds occasionally and ten pounds frequently; stand/walk
and sit for about six hours each in a normal workday; and push/pull
without limitation.  He opined Fintics could kneel and balance
frequently, and perform all other postural activities occasionally.
He found Fintics to have no manipulative, visual, environmental, or
communicative limitations.  He opined Fintics could perform work at
the "light" level, but noted this was a "generous" assessment given
that most of Fintics's restrictions were based on his subjective
complaints.  The doctor noted that "objective findings show
[Fintics] doing pretty well actually[.]" A.R. 346.

**D.    Summary of Fintics's Hearing Testimony**

Fintics was 45 years old at the time of the ALJ hearing on
August 6, 2009.  He is 5'8" tall, and weighs 300 pounds.  In mid-
September 2001, he weighed about 200 pounds.  He attributes his
weight gain to depression, and to medications he tried for his
depression.  A.R. 23, 38.

According to Fintics, he first was diagnosed with depression
in "either 2000 or 2003."  A.R. 23.  He tried various medications
without success, stating they seemed to make his condition worse.
In addition, the medications caused "severe weight gain," despite
loss of appetite.  A.R. 38.  He saw therapists at times, as well,
but the last one he saw told him he was suffering from "dysthymia
and that medications usually don't help that."  A.R. 24.

Fintics stated when he was a young child, he saw his father
beat up his mother, and he had to testify about it, causing him to

48 - MEMORANDUM OPINION AND ORDER

suffer ongoing post-traumatic stress disorder.  He talked with his therapists about his past, but he was having difficulty keeping appointments since moving out of the downtown area, where he had ready access to the Old Town Clinic.  He saw medical doctors at the same clinic for his physical health problems, and therapists for his mental health problems.

Fintics stated his depression and PTSD have "worsened severely" since 2004, to the point that sometimes he is unable to function.  A.R. 28.  He experiences "[s]evere hopelessness and high anxiety and anxiety attacks, frustration, agitation, sleeplessness, loneliness, [and] isolation."  *Id.*  He recently had moved to an apartment and was living alone, after spending five years in a community housing arrangement where he had a support system.  He experiences problems with motivation, and spends a lot of time "laying in bed and kind of curled up and feeling very hopeless and depressed and full of anxiety."  A.R. 30.  He seldom leaves his apartment.  He has no income, paying for his housing with Section 8 funds, and living on food stamps.  A.R. 30-31.

Fintics stated when his anxiety is bad, he develops rashes and nausea.  He also has "chronic ongoing back pain" from "two bulged disks."  A.R. 31.  He stated his "right hip is misaligned," and he has a disk rubbing against his tail bone.  A.R. 31-32.  He has to adjust his position frequently from sitting to standing to lying down, but his pain is chronic and severe in all positions.  A.R. 32.  He estimated his pain remains at about a seven on a ten-point scale, sometimes rising to an eight if he moves around too much or maintains the same position for too long.  In addition, his left leg sometimes becomes numb.  A.R. 33.  He spends up to sixteen

49 - MEMORANDUM OPINION AND ORDER

hours a day lying down because he is chronically fatigued.  A.R. 38.  He stated his symptoms are present whether or not he is drinking, although alcohol gives him some short-term relief from his symptoms.  A.R. 39.

Regarding his history of alcohol abuse, Fintics stated that over the years, he has gone for long stretches without drinking, but then he drinks to self-medicate, "trying to get some relief for [his] depression symptoms[.]"  A.R. 36.  He frequently has gone six to eight months without drinking, but "it would always come down to a breaking point of trying to seek relief and trying to self-medicate."  *Id.*  At the time of the ALJ hearing, he stated he was drinking about once a month.  A.R. 37.  He stated he took drugs when he was younger, but he stopped because he "didn't want to live that way."  *Id.*

Fintics stated he usually does not get out of bed until the afternoon.  He might sit on the porch for awhile, try to move around a bit, and then lie back down.  He has difficulty just opening his eyes to function.  He eats very little.  He used to socialize with friends a couple of times a week, but for the five months preceding the ALJ hearing, since his move to the apartment, he had been very isolated.  He also used to go to Alcoholics Anonymous and Narcotics Anonymous meetings almost daily, and felt these programs helped him a "little bit," but he does not go to many meetings anymore.  He stated his depression interferes with his relationships with others because he does not talk much and is less involved than others.  A.R. 40-41.  According to Fintics, his therapist has told him that his symptoms are not likely to improve, and he will just have to learn to live with them.  Fintics stated

50 - MEMORANDUM OPINION AND ORDER

this knowledge gives him "severe suicidal thoughts." A.R. 41.  He
has lost interest in things he used to enjoy, and he has a "very
hard time dealing with [his] situation." *Id.*  Moving out of the
community housing has made his condition worse because he lacks a
support group at his new location.  *Id.*

**E.   Vocational Expert's Testimony**

The VE listed Fintics's past relevant work as car lot
attendant, "basically inspecting and cleaning cars," which the VE
characterized as medium, unskilled work, SVP 2 level[8]; dishwasher,
also medium, unskilled work, SP2 level; gas station attendant,
medium, semi-skilled work, SVP 3 level; and waiter, which is light,
semi-skilled work, SVP 3 level.  A.R. 42-43.

The ALJ asked the VE the following hypothetical question:

> I want you to assume an individual with
> the same age, education and work experience as
> [Fintics], but I want you to assume the
> individual was 37 years of age at the alleged
> date of onset of 9/15/01, with an eleventh
> grade education, primarily worked in unskilled
> and semi-skilled jobs.  Based on the testimony
> and the medical records thus far I conclude
> that the exertional limitation would be . . .
> that of light.  Able to sit six out of eight,
> stand or walk six out of eight.  Lift and
> carry 20 to 10 pounds occasionally and fre-

---

[8]"SVP" refers to the level of "specific vocational prepara-
tion" required to perform certain jobs, according to the *Dictionary
of Occupational Titles*.  The SVP "is defined as the amount of
lapsed time required by a typical worker to learn the techniques,
acquire the information, and develop the facility needed for
average performance in a specific job-worker situation." *Davis v.
Astrue*, slip op., 2011 WL 6152870, at *9 n.7 (D. Or. Dec. 7, 2011)
(Simon, J.) (citation omitted).  "The DOT identifies jobs with an
SVP level of 1 or 2 as unskilled, jobs with an SVP of 3 or 4 as
semi-skilled, and jobs with an SVP of 5 or higher as skilled."
*Whitney v. Astrue*, slip op., 2012 WL 712985, at 3 (D. Or Mar. 1,
2012) (Brown, J.) (citing SSR 00-4p).

1               quently.  With an occasional posterior [sic]
2               limitation regarding climbing, balance,
              bending. Never climbing ladders, scaffolds or
3               ropes. Frequent use of bilateral hands.
              Would be able to understand, remember and
4               carry out say like complex and simple instruc-
              tions.  Limited contact with co-workers and
5               supervisors. Based on that - those limitations
              could the individual perform any of his past
6               work?

7 A.R. 44.   The VE stated the hypothetical individual could not

8 perform any of Fintics's past work because of the limitation on

9 contact with co-workers and supervisors.  A.R. 45.  However, the

10 individual would be able to work in light, unskilled jobs such as

11 garment sorter, small products assembler, and unskilled cashier.

12 A.R. 46-47.

13     The ALJ asked a second hypothetical question, as follows:

14               If the medical records are supported - excuse
              me, the testimony is supported by [Fintics]
15               and the medical records that we're awaiting
              indicate that the individual in the hypo-
16               thetical would not be able to concentrate up
              to at least one-third of the time and or focus
17               their attention on tasks because of his PTSD
              and severe depression . . . would that person
18               be able to perform any of the jobs you
              mentioned?
19

20 A.R. 47.  The VE responded in the negative.  *Id.*

21

22 **III.  DISABILITY DETERMINATION AND THE BURDEN OF PROOF**

23                 **A.  Legal Standards**

24     A claimant is disabled if he or she is unable to "engage in

25 any substantial gainful activity by reason of any medically

26 determinable physical or mental impairment which . . . has lasted

27 or can be expected to last for a continuous period of not less than

28 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

52 - MEMORANDUM OPINION AND ORDER

"Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Commissioner*, 648 F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520). The Keyser court described the five steps in the process as follows:

> (1) Is the claimant presently working in a substantially gainful activity?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of a list of specific impairments described in the regulations?  (4) Is the claimant able to perform any work that he or she has done in the past?  and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Keyser*, 648 F.3d at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)); *see Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520 (b)-(f) and 416.920 (b)-(f)).  The claimant bears the burden of proof for the first four steps in the process.  If the claimant fails to meet the burden at any of those four steps, then the claimant is not disabled.  *Bustamante*, 262 F.3d at 953-54; *see Bowen v. Yuckert*, 482 U.S. 137, 140-41, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987); 20 C.F.R. §§ 404.1520(g) and 416.920(g) (setting forth general standards for evaluating disability), 404.1566 and 416.966 (describing "work which exists in the national economy"), and 416.960(c) (discussing how a claimant's vocational background figures into the disability determination).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual

53 - MEMORANDUM OPINION AND ORDER

functional capacity, age, education, and word experience." *Tackett*
*v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).  If the Commissioner
fails meet this burden, then the claimant is disabled, but if the
Commissioner proves the claimant is able to perform other work
which exists in the national economy, then the claimant is not
disabled.  *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R.
§§ 404.1520(f), 416.920(f); *Tackett*, 180 F.3d at 1098-99).

     The ALJ determines the credibility of the medical testimony
and also resolves any conflicts in the evidence.  *Batson v. Comm'r*
*of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) (citing
*Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)).
Ordinarily, the ALJ must give greater weight to the opinions of
treating physicians, but the ALJ may disregard treating physicians'
opinions where they are "conclusory, brief, and unsupported by the
record as a whole, . . . or by objective medical findings."  *Id.*
(citing *Matney, supra*; *Tonapetyan v. Halter*, 242 F.3d 1144, 1149
(9th Cir. 2001)).  If the ALJ disregards a treating physician's
opinions, "'the ALJ must give specific, legitimate reasons'" for
doing so.  *Id.* (quoting *Matney*).

     The law regarding the weight to be given to the opinions of
treating physicians is well established.  "The opinions of treating
physicians are given greater weight than those of examining but
non-treating physicians or physicians who only review the record."
*Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1036 (9th Cir.
2003).  The *Benton* court quoted with approval from *Lester v.*
*Chater*, 81 F.3d 821, 830 (9th Cir. 1995), where the court held as
follows:

54 - MEMORANDUM OPINION AND ORDER

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant. At least where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons. We have also held that "clear and convincing" reasons are required to reject the treating doctor's ultimate conclusions. Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for so doing.

*Lester*, *supra*.

The ALJ also determines the credibility of the claimant's testimony regarding his or her symptoms:

> In deciding whether to admit a claimant's subjective symptom testimony, the ALJ must engage in a two-step analysis. *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). Under the first step prescribed by *Smolen*, . . . the claimant must produce objective medical evidence of underlying "impairment," and must show that the impairment, or a combination of impairments, "could reasonably be expected to produce pain or other symptoms." *Id.* at 1281-82. If this . . . test is satisfied, and if the ALJ's credibility analysis of the claimant's testimony shows no malingering, then the ALJ may reject the claimant's testimony about severity of symptoms [only] with "specific findings stating clear and convincing reasons for doing so." *Id.* at 1284.

*Batson*, 359 F.3d at 1196.

**B.   *The ALJ's Decision***

The ALJ issued his decision on September 1, 2009, less than a month after Fintics's hearing. In summarizing the ALJ's decision, the court has made several notable observations, discussed below.

The ALJ found that Fintics has severe impairments consisting of "substance use disorder, affective disorder, [and] mild disk degeneration[.]" A.R. 58. He noted Fintics underwent two separate psychodiagnostic evaluations, one at the initial level and one at the reconsideration level, and both evaluators found no substantive evidence to justify a diagnosis of bipolar disorder. A.R. 58. The ALJ further noted that Dr. Givi, the second evaluator, also found no clinical justification for diagnoses of PTSD or generalized anxiety disorder. A.R. 58. However, despite the evaluators' opinions that Fintics was malingering to some degree, the ALJ found that "insofar as [Fintics] has consistently presented depressive symptoms to mental health professionals, independent of recurring substance abuse issues, his affective disorder is deemed both medically determinable and 'severe.'" *Id.*

The court finds the great weight the ALJ gave the consulting psychologists' opinions to be misplaced. The only medical records reviewed by either of the consulting psychologists were those from Fintics's brief hospitalization from January 8 to January 11, 2006, and doctors' notes from January 28, 2004, to June 8, 2004. Those records represent only a small fraction of Fintics's relevant medical history. Similarly, the most recent Mental Residual Functional Capacity Assessment was done in mid-April 2007. The ALJ failed to discuss Fintics's significant mental health history, making only a few cursory observations. *See* A.R. 59 (noting Fintics's "symptoms [have] also been variously and provisionally diagnosed as either post-traumatic stress disorder, bipolar disorder, depression, not otherwise specified, or dysthymia," with these diagnoses being "revised frequently by his therapists, often

56 - MEMORANDUM OPINION AND ORDER

1  reflecting the inconsistent history and symptoms presented by the
2  claimant").    The  ALJ  did  not  discuss  Fintics's  frequent
3  hospitalizations in 2009.   Although the ALJ noted Fintics has
4  refused medication for his mental problems, he did not discuss the
5  side effects Fintics reported from medications at the times he took
6  them, or the one provider's opinion that medications were unlikely
7  to assist Fintics's problem.   The ALJ's decision is deficient in
8  these respects.

9          The ALJ's findings regarding Fintics's back pain are incon-
10  sistent.   The  ALJ  found  his  "mild disk degeneration"  to be  a
11  "severe impairment."   A.R.  58.   The  ALJ  then  noted  the  record
12  evidence in support of Fintics's complaint of lower back pain was
13  "scanty at best," and stated Fintics's "mild lumber degeneration is
14  considered  a  medically  determinable  but  nonsevere  impairment."
15  A.R.  59.   The Record contains a bit more than "scanty" evidence of
16  Fintics's  complaints  of  lower  back  pain.    Imaging  studies  have
17  shown he has degenerative changes at L5-S1 that have been charac-
18  terized at various times as moderate to severe.   The ALJ discounted
19  one of the radiology reports because it was "handwritten," "signed
20  by a chiropractic college resident," and not "a final typewritten
21  report."   A.R.  59.   It was inappropriate to discount the report
22  because it was handwritten.   That the report was issued by a chiro-
23  practic resident, particularly where the results were consistent
24  with later imaging studies by medical doctors, seems immaterial.
25  Nevertheless,  the  ALJ  correctly  observed  that  "until  2008,
26  [Fintics] rarely complained [of] back pain to treating providers."
27  *Id.*  The court cannot reconcile these inconsistencies in the ALJ's
28

57 - MEMORANDUM OPINION AND ORDER

1  decision.    Upon  remand,  the  ALJ  should  clarify  his  findings

2  regarding Fintics's allegation of disabling back pain.

3      The ALJ found that although Fintics's mental impairments are

4  severe, they do not meet or medically equal any Listed impairment,

5  and specifically "do not meet or medically equal the criteria of

6  listings 12.04 and 12.09." A.R. 59.  He found Fintics to be mildly

7  restricted  in  his  activities  of  daily  living  and  social

8  functioning, adopting the reasoning of Drs. Rethinger and Anderson.

9  He then noted, "However, with regard to concentration, persistence

10 or pace, [Fintics] has moderate difficulties[;] the undersigned

11 accepts that [Fintics's] impairment may be greater than assessed by

12 the state medical agency." A.R. 60.  The ALJ further found Fintics

13 had not experienced any episodes of decompensation that were of

14 extended  duration.    He  found  that  although  Fintics  "has  been

15 hospitalized for substance or alcohol abuse, [his] treatments were

16 not of extended duration."[9]  *Id.*  Therefore, because he did not

17 find Fintics to have "at least two 'marked' limitations or one

18 'marked' limitation and 'repeated' episodes of decompensation, each

19 of  extended  duration,"  Fintics  did  not  meet  the  criteria  of

20 "paragraph B of the adult mental disorders listings as 12.00 of the

21 Listing of Impairments." *Id.; see* 20 C.F.R. pt. 404, subpt. P, app.

22 1, § 12.00(A) (describing the "paragraph B" and "paragraph C"

23 criteria).    He  similarly  found  the  record  evidence  does  not

24 establish the presence of the "paragraph C" criteria.  *Id.*

25

26

27      [9]With two hospitalizations of eleven days' duration and one of

28 thirteen days' duration, one is left to wonder what the ALJ would
   consider to be an "extended duration."

58 - MEMORANDUM OPINION AND ORDER

In assessing Fintics's RFC, the ALJ noted his RFC assessment reflected the degree of limitation he had found in connection with the "paragraph B" analysis. *Id.* He found Fintics has the following RFC:

> After careful consideration of the entire record, the undersigned finds that [Fintics] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except no more than occasional balancing, bending, climbing of stairs or ramps; never climbing ladders, scaffolds, or ropes; frequent bilateral use of hands; no more than simple to semi-complex instructions, and limited contact with coworkers and supervisors.

A.R. 60-61. The ALJ found Fintics's claims of his hip misalignment and leg pain are not supported by any objective medical evidence of record. A.R. 61. He noted Fintics alleges "peripheral edemas in his upper and lower extremities. The medical evidence of record indicates that this condition afflicted [him], albeit, extremely infrequently. To the extent that his allegation is credible, the [RFC] addresses it with limitations on climbing, balancing, and use of hands." *Id.*

With regard to Fintics's claim of disabling depression, the ALJ noted that Fintics's testimony at the hearing "indicated little in the way of work-related functional limitations. [His] medical records are replete with [his] adamant refusal to treat his depressive symptoms through medication, which calls into question the severity of [his] alleged mental impairment." *Id.* (citations to exhibits omitted).

The ALJ gave "little to no weight" to Dr. Bajaj's opinions regarding Fintics's functional capacity, noting that Dr. Bajaj, a naturopathic doctor, does not qualify as an "acceptable medical

59 - MEMORANDUM OPINION AND ORDER

source." A.R. 62. He also found Dr. Bajaj's opinions to be inconsistent with Fintics's testimony regarding his lifting ability, exertional capabilities, and the doctor's own records. *Id.* Indeed, the court agrees that Dr. Bajaj's estimation of Fintics's functional abilities seems disproportionately severe.

The ALJ also discounted NP Burckhardt's assessment that Fintics has marked limitations of social functioning. He noted Fintics testified he has no problems getting along with people, and after he moved, he quickly affiliated with a local church and regularly socialized with friends. The ALJ noted NP Burckhardt's opinion that Fintics has marked limitations of concentration, persistence, and pace was supported only by notations that he missed appointments or arrived late. He noted, "In sum, the opinions of Ms. Burckhardt had little weight to suggest that [Fintics] was markedly limited in any domain of mental functioning." *Id.* The ALJ gave "probative weight" to the opinions of Drs. Rethinger and Anderson, "as expert opinion evidence by a non-examining source." *Id.* As noted above, these sources had very limited records to review, calling into question the probative weight to be given their opinions. The value of a reviewer's opinion is usually that he or she has access to the entire medical record, which in some cases a treating doctor does not. That is not true for Drs. Rethinger and Anderson.

Relying on the VE's testimony, the ALJ found Fintics could not return to his past relevant work as a gas station attendant, waiter, car lot attendant, or dishwasher. *Id.* However, he found Fintics could perform a modified range of light work that exists in significant numbers in the national economy, citing examples of

60 - MEMORANDUM OPINION AND ORDER

1  garment sorter, assembler, and cashier.  A.R. 63.  The ALJ found
2  the VE's testimony to be "consistent with information contained in
3  the Dictionary of Occupational Titles."  *Id.*  Because he found
4  Fintics is able to work, the ALJ therefore found him to be "not
5  disabled."  *Id.*  He further noted, "in the alternative, the medical
6  evidence indicates that alcohol and drug abuse are material factors
7  contributing to [Fintics's] severe mental impairments that would
8  preclude a finding of disability."  A.R. 64.
9
10                    *IV.  STANDARD OF REVIEW*
11      The court may set aside a denial of benefits only if the
12  Commissioner's findings are "'not supported by substantial evidence
13  or [are] based on legal error.'"  *Bray v. Comm'r of Soc. Sec.*
14  *Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v.*
15  *Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)); *accord Black*
16  *v. Comm'r of Soc. Sec. Admin.*, slip op., 2011 WL 1930418, at *1
17  (9th Cir. May 20, 2011).  Substantial evidence is '"more than a
18  mere scintilla but less than a preponderance; it is such relevant
19  evidence as a reasonable mind might accept as adequate to support
20  a conclusion.'"  *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035,
21  1039 (9th Cir. 1995)).
22      The court "cannot affirm the Commissioner's decision 'simply
23  by isolating a specific quantum of supporting evidence.'"  *Holohan*
24  *v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*
25  *v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)).  Instead, the court
26  must consider the entire record, weighing both the evidence that
27  supports the Commissioner's conclusions, and the evidence that
28  detracts from those conclusions.  *Id.*  However, if the evidence as

1   a whole can support more than one rational interpretation, the
2   ALJ's decision must be upheld; the court may not substitute its
3   judgment for the ALJ's. *Bray*, 554 F.3d at 1222 (citing *Massachi v.*
4   *Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

5

6                        *V.   DISCUSSION*

7        Fintics argues the ALJ erred in failing to include, in his
8   hypothetical question to the VE, a limitation found in the ALJ's
9   own RFC assessment; i.e., that Fintics would be limited to "no more
10  than simple to semi-complex instructions." A.R. 61; *see* Dkt. #19,
11  pp. 2, 4-5.   The Commissioner concedes the ALJ's hypothetical
12  question, in which he asked the VE to consider someone who "would
13  be able to understand, remember and carry out like complex and
14  simple instructions," was erroneous.  Dkt. #25, pp. 5-6.  However,
15  the Commissioner argues the error was harmless because the jobs
16  identified by the VE actually fall within the ALJ's RFC limitation.
17  *See id.*, pp. 6-8.  *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533
18  F.3d 1155, 1162 (9th Cir. 2008) (ALJ's error may be harmless if it
19  is "'inconsequential to the ultimate nondisability determina-
20  tion.'") (quoting *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050,
21  1055 (9th Cir. 2006)).  In other words, the Commissioner asks the
22  court to conclude that *if* the ALJ had posed a proper hypothetical
23  question to the VE, the VE's answer would have been the same.  The
24  court cannot affirm based on speculation as requested.
25        An ALJ must include in his hypothetical question to a VE "all
26  the limitations and restrictions of the particular claimant[.]"
27  *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989) (citation
28  omitted); *accord, e.g., Paden v. Barnhart*, 92 Fed. Appx. 465, 467

1  (9th Cir. 2004)); *see Osenbrock v. Apfel*, 240 F.3d 1157, 1163 (9th

2  Cir. 2001), cited by the Commissioner, where the court held, "An

3  ALJ must propose a hypothetical that is based on medical

4  assumptions supported by substantial evidence in the record that

5  reflects each of the claimant's limitations." *Id.*; Dkt. #25, p. 8.

6  When a hypothetical question fails "to reflect each of the

7  claimant's limitations that are supported by substantial evidence,

8  the expert's answer has no evidentiary value," and therefore

9  "'cannot constitute substantial evidence to support the ALJ's

10 findings.'" *Paden*, *supra* (quoting *Gallant v. Heckler*, 753 F.2d

11 1450, 1456 (9th Cir. 1984)).

12      Here, the ALJ relied on the VE's testimony in finding Fintics

13 is able to perform a modified range of light work, and therefore,

14 he is not disabled. A.R. 63. Because that conclusion was based on

15 an improper hypothetical question, it is not supported by

16 substantial evidence. Moreover, when the ALJ added, in his second

17 hypothetical question, the limitation of an inability to

18 concentrate and focus on tasks "up to at least one-third of the

19 time" because of mental impairments, the VE stated the hypothetical

20 individual would be unable to work. A.R. 47. The VE's response to

21 the second hypothetical question could mandate a finding of

22 disability. However, as discussed below, such a result is less

23 than clear in this case. *See Bustamante v. Massanari*, 262 F.3d

24 949, 954 (9th Cir. 2001) ("A finding of 'disabled' under the five-

25 step inquiry does not automatically qualify a claimant for

26 disability benefits . . . if alcoholism or drug addiction would

27 . . . be a contributing factor material to the Commissioner's

28

1  determination that the individual is disabled.") (internal
2  quotation marks, citations omitted).

3       Fintics also argues the ALJ erred in finding his testimony was
4  not credible to the extent it was inconsistent with the ALJ's RFC
5  finding.  Dkt. #19, pp. 5-6.  Pointing to *Glover v. Astrue*,
6  No. 03:09-00484-AC, 2011 WL 1230045 (D. Or. Mar. 10, 2011) (Marsh,
7  J., adopting Findings and Recommendations by Acosta, M.J.), Fintics
8  argues this Court recently has "disapproved precisely this sort of
9  self-fulfilling reasoning." Dkt. #19, p. 5 (citing *Glover*, 2011 WL
10  1230045, at *7).  In *Glover*, the court considered a similar finding
11  by the ALJ, and held as follows:

12             The court first notes that the ALJ's
       analysis reverses the manner in which she must
13       consider credibility.  The ALJ must consider a
       claimant's credibility in the course of
14       assessing a claimant's residual functional
       capacity.  20 C.F.R. §§ 404.1545(a)(3);
15       416.945(a)(3); SSR 96-8p at *7 (available at
       1996 WL 374184).  Here, the ALJ first found
16       that Glover's credibility was limited "to the
       extent" his statements "are inconsistent with
17       the . . . residual functional capacity
       assessment. . . ."  [Citation omitted.]  No
18       authority suggests an ALJ may reason that a
       claimant is not credible based upon the
19       claimant's RFC assessment.  The ALJ's finding
       that Glover is not credible based upon his RFC
20       disregards the role of credibility analysis in
       determining an RFC and therefore should not be
21       sustained.

22  *Id.*  Notably, this finding was not challenged by the Commissioner
23  in *Glover*, and the Magistrate Judge's findings and recommendations
24  were adopted without objection.

25       The Commissioner argues the present case differs from Glover,
26  in which "[t]he Magistrate Judge . . . found that the ALJ's
27  subsequent analysis with respect to the claimant's work history and
28  medical evidence was not based on the record and amounted to no

64 - MEMORANDUM OPINION AND ORDER

1  analysis at all." Dkt. #25, p. 9 (citing *Glover*, 2011 WL 1230045,
2  at *5).  The Commissioner argues that here, the ALJ gave clear and
3  convincing reasons for discounting Fintics's credibility.  The ALJ
4  identified  numerous  ways  in  which  Fintics's  alleged  physical
5  symptoms  are  not  supported  by  the  medical  evidence  of  record.
6  Regarding  Fintics's  mental  symptoms,  the  ALJ  noted  Fintics
7  repeatedly  refused  medications  to  treat  his  symptoms.   The  ALJ
8  found  such  refusal  called  into  question  the  severity  of  Fintics's
9  alleged  mental  impairment.  A.R. 61.  The Commissioner argues the
10 medical  records  show  Fintics's  symptoms  improved  during  those
11 periods  when  he  took  medications.   Relying  on  these  as  clear  and
12 convincing  reasons  for  the  ALJ  to  discount  Fintics's  credibility,
13 the  Commissioner  argues  it  was  proper  for  him  to  find  Fintics's
14 subjective  complaints  were  credible  only  to  the  extent  they  were
15 consistent  with  the  RFC.  Dkt. #25, pp. 10-11.  The Commissioner
16 cites, *inter alia*, *Hillman-Killian v. Astrue*, No. 03:09-cv-00581-
17 JE, 2010 WL 5426780 (D. Or. Dec. 27, 2010) (Jelderks, M.J.), where
18 the  ALJ  made  a  credibility  finding  similar  to  the  one  Fintics
19 challenges here.  The *Hillman-Killian* court found that because the
20 ALJ had "provided legally sufficient reasons" for discounting the
21 claimant's  credibility,  the  "ALJ  did  not  deviate  from  the  normal
22 sequence  of  credibility  analysis."  *Id.*, 2010 WL 5426780, at *5.
23 The court held, "A careful review of the ALJ's decision supports
24 the  conclusion  that  the  ALJ  did  not  discount  [claimant's]  credi-
25 bility  because  her  statements  were  inconsistent  with  the  RFC  he
26 assigned, but for independent reasons."  *Id.*
27     A similar analysis is appropriate here.  The ALJ made it clear
28 that  his  RFC  assessment  was  based  on  his  consideration  of  "all

65 - MEMORANDUM OPINION AND ORDER

symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. . . .  [He] also considered opinion evidence. . . ." A.R. 61.  The ALJ noted inconsistencies between Fintics's testimony and the objective medical evidence.  He also noted that at the hearing, Fintics, himself, "stated that he could occasionally lift 40 pounds, and lift and carry 25 pounds on a frequent basis." *Id.*  He noted that Fintics has alleged he is limited by peripheral edema in his upper and lower extremities, and then noted to the extent that allegation is credible, the ALJ had taken it into account in the RFC "with limitations on climbing, balancing, and use of hands." *Id.*  Although the ALJ made some errors in his credibility analysis, such as failing to consider the untoward side effects Fintics experienced from his medications, and Fintics's testimony that his therapist told him antidepressants were unlikely to help his dysthymia, the ALJ nevertheless followed the correct sequence of credibility analysis.

However, Fintics also argues the ALJ erred in failing to make *any credibility finding at all* with regard to his testimony that his debilitating symptoms are present whether or not he is drinking.  The ALJ did not discuss the effect or materiality of Fintics's alcoholism, other than to state "the medical evidence indicates that alcohol and drug abuse are material factors contributing to [Fintics's] severe mental impairments that would preclude a finding of disability." A.R. 64.

Because the ALJ found Fintics not to be disabled in the initial analysis, he did not continue to perform the analysis required by the regulations to determine whether Fintics's addic-

66 - MEMORANDUM OPINION AND ORDER

tion to alcohol or other drugs is "a contributing factor material to the determination of disability." 20 C.F.R. §§ 404.1535(a) & 416.935(a). If the ALJ's disability analysis otherwise were correct, his failure to make a specific credibility finding relating to the effects of Fintics's alcohol abuse would be irrelevant. *Cf. Ball v. Massanari*, 254 F.3d 817, 819-22 (9th Cir. 2001) (when substantial evidence supports ALJ's determination that claimant's mental impairment is not severe in the first place, ALJ is not required to conduct an analysis of whether alcohol use is a contributing factor). Here, however, where the court has found the ALJ erred in his disability finding because he relied on inadequate vocational evidence, his failure to discuss Fintics's alcohol abuse thoroughly becomes more relevant.

The ALJ found Fintics to have a severe mental impairment, noting he had complained consistently to his medical providers of depression. Based on the second hypothetical question to the VE, where the VE stated someone with a moderate impairment in concentration and focus, together with Fintics's other impairments, would be unable to work, it appears likely that a finding of disability will be warranted upon remand. In such an event, the evidence in this case cries out for a detailed analysis of whether Fintics's alcoholism is a contributing factor material to the determination that he is disabled. *See* 42 U.S.C. §§ 423(d)(2)(c) & 1382c(a)(3)(J); 20 C.F.R. §§ 404.1535(a) & 416.935(a).

### VI. CONCLUSION

For the above reasons, this case requires remand for further proceedings. Accordingly, the Commissioner's decision is **reversed**,

67 - MEMORANDUM OPINION AND ORDER

1 and this case is **remanded for further proceedings** consistent with

2 this opinion.

3      IT IS SO ORDERED.

4                          Dated this __29th__ day of March, 2012.

5                          /s/ Dennis J. Hubel

6                          _____

7                          Dennis James Hubel
                           Unites States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

68 - MEMORANDUM OPINION AND ORDER